[No. 35736.   En Banc.   January 24, 1963.]

CLIFFORD WHARTON, *Respondent,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant.**

*The Attorney General* and *James E. Nelson, Assistant,* for appellant.

*Reported in 378 P. (2d) 290.

*Robert H. Thompson* (of *Walthew, Warner & Keefe*), for respondent.

The defendant, the Department of Labor and Industries, appeals from a judgment for the plaintiff in an industrial insurance case.

▆ The primary issue raised by several assignments of error challenges the sufficiency of the evidence to sustain the verdict for the plaintiff. Before considering the evidence, it is well to repeat the applicable rule in considering the sufficiency of the evidence to support a verdict. It was stated by the late Judge Olson in *Arnold v. Sanstol,* 43 Wn. (2d) 94, 98, 260 P. (2d) 327, as follows:

"A verdict will not be set aside unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from the evidence to support the verdict. The evidence must be viewed in the light most favorable to the party against whom the motion is made. All competent evidence favorable to the party who obtained the verdict must be taken as true, and that party must be given the benefit of every favorable inference which reasonably may be drawn from the evidence. If there is substantial evidence to support the verdict, it must stand. Substantial evidence is that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. *Rettinger v. Bresnahan,* 42 Wn. (2d) 631, 633, 257 P. (2d) 633 (1953), and case cited."

As indicated in the foregoing quotation, the evidence must be viewed in the light most favorable to the respondent. The appellant, on the other hand, here disregards entirely the respondent's proofs and considers only its own. At best, it may be said that the evidence is in conflict on the relationship of cause and effect between the accident and the disability, but the resolution of this dispute is for the jury and not the court. The respondent's proof showed that he was 38 years of age at the time of the injury sustained when the truck he was driving collided head on with an automobile. Respondent, observing the certainty of the collision, clung to the steering wheel and lay down on the front seat. The impact threw his head against the dash and

smashed his tin hat. The gearshift handles hit him below his chest. His chief complaints, at the time of his hospitalization following the injury, were in his neck and head. There was a stinging and burning in his stomach just above the navel. Prior to the accident, he had no trouble with his chest or stomach. He was nauseated for a period of two months following the injury and complained of "charley horses." He had difficulty in walking. The stomach complaints increased and his legs became numb. He was operated for an occlusion of the abdominal artery, and his right leg was subsequently amputated.

Dr. Frank James testified in his behalf. He examined the respondent and testified that, as a result of the accident, he found:

"(1) Traumatic crushing injuries of abdomen, aorta, and chest, old; (2) traumatic injury of neck and left shoulder and arm, old; . . ."

As a result of his examination, he expressed the opinion that there was a direct relationship of cause and effect between the injury and the disability. His reasons therefor are as follows:

"A. Yes, in my opinion the trauma that Mr. Wharton sustained as of his injury of 6th of October, 1953, was in the nature of a crushing injury to the chest and abdomen in that the gear shift levers were forced up into the chest and abdomen just below the breastbone and that such a blow compresses or shoves together between the gearshift lever and the backbone the aorta, which is the biggest artery in the body, and in so doing it bruises that vessel; where the walls are bruised, a resulting scar tissue is formed and over a period of time, this scar tissue contracts, causing or aggravating an occlusion of the aorta so that it interferes with the circulation to the extent that the occlusion has to be removed if possible and cured with an artery transplant; and at that time, at the time of the heart surgery for the occlusion, a blood clot formed known as a thrombosis in the right leg shutting off circulation of the right leg and requiring an immediate amputation of the right leg and that after the patient got over the operation he still had a circulatory deficiency over his entire body, but particularly marked in the left arm and left leg."

■ The gist of the appellant's argument is that the hypothetical questions propounded to Dr. James by the respondent's counsel did not embrace the proofs that were afterwards made by the appellant. The argument completely overlooks the fact that neither the appellant's counsel nor the counsel for the respondent's employer (who participated fully in the proceeding) cross-examined Dr. James as to whether his opinion would be changed or not if the facts subsequently developed by the appellant were taken into account. It was perfectly proper for appellant's counsel to embrace such facts within hypothetical questions to be propounded by them in their cross-examination of Dr. James, but they did not do so. Under this state of the record, the applicable rule was stated in *Wilson v. Pacific Power & Light Co.*, 171 Wash. 232, 17 P. (2d) 846, as follows:

"At the time that the question was propounded, there was no evidence that irrigation water from other lands might be the cause. It was proper for respondents to frame the hypothetical question upon the theory of their case and under the evidence introduced by them. *Griggs v. Wayne*, 100 Wash. 459, 171 Pac. 230; *McEachran v. Rothschild & Co.*, 135 Wash. 260, 237 Pac. 711, 241 Pac. 969. Furthermore, appellant's counsel was privileged to, and did, upon cross-examination, bring to the attention of the witness the very element which it now claims was omitted from the original question, and received an unfavorable answer to his question. The assignment is not well taken."

■ Nor is there any merit in the appellant's contention that it was necessary for the respondent to include, in the hypothetical questions submitted to Dr. James, the facts which were subsequently developed in the appellant's proof. It is necessary that the hypothesis include only the facts developed by the respondent's own evidence. *Wilson v. Pacific Power & Light Co., supra; McEachran v. Rothschild & Co.*, 135 Wash. 260, 237 Pac. 711, 241 Pac. 969; and *Griggs v. Wayne*, 100 Wash. 459, 171 Pac. 230.

The remaining assignments of error are related to the first. Error is assigned upon the refusal to instruct that the hypothetical question to an expert witness, which assumes the truth of a particular fact, depends upon the truth of

the matters embraced in the hypothesis and whether all essential facts have been included. The exception taken to the refusal to give this instruction was that the hypothesis did not include the matters embraced in the evidence of the appellant which was subsequently introduced but not in evidence at the time. This involves the same problem heretofore decided.

In other instructions, the jury was told that they should consider an expert's opinion and weigh the reasons given for it, and accept or reject such opinion according to the reasons given for it. The respondent was not required to include in the hypothesis submitted to its expert matters subsequently covered by the appellant's evidence. It is sufficient if the hypothesis fairly embraces the evidence as it existed at the time the witness testified.

There was no error in refusing the requested instruction.

The judgment is affirmed.

OTT, C. J., DONWORTH, FINLEY, HUNTER, and HAMILTON, JJ.—The foregoing opinion had been prepared by Judge Harry Ellsworth Foster, but it had not been filed before his death. The following members of the court have adopted it as their opinion, and, for the reasons therein assigned, affirm the judgment.

ROSELLINI, J. (dissenting)—On October 6, 1953, the respondent was involved in a head-on collision between a truck he was driving and an automobile. A report of the accident was filed and the claim was allowed, and on January 5, 1954, his case was closed without any award for permanent partial disability, time loss, or medical treatment, inasmuch as the respondent elected, with the consent of the department, to seek redress against the automobile driver in a third-party action.

Subsequently, on September 14, 1956, the plaintiff filed an application to reopen the claim for aggravation of his condition, and on March 18, 1957, the Supervisor of Industrial Insurance entered an order denying the application and the responsibility of the department for the respondent's

loss of his right leg, chest complaints, and vascular disease. On appeal to the Board of Industrial Insurance Appeals, the decision of the supervisor was affirmed. A further appeal to the Superior Court of Thurston County resulted in a jury verdict in favor of the respondent.

The appellant, the Department of Labor and Industries, contends that its motions to dismiss for lack of evidence to sustain a verdict should have been granted. Specifically, it urges that the testimony of the respondent's one medical witness was insufficient to establish a causal connection between the accident and the subsequent condition of the respondent because, in answering the hypothetical question posed to him, the doctor assumed facts which were not contained in the question nor supported by the evidence.

It is well established that, if a doctor's opinion is based upon a hypothetical question and he assumes the existence of material conditions not established by the evidence or not included in the question or inferable therefrom, he destroys the validity of his answer. *Clayton v. Department of Labor & Industries,* 48 Wn. (2d) 754, 296 P. (2d) 676; *Cyr v. Department of Labor & Industries,* 47 Wn. (2d) 92, 286 P. (2d) 1038.

The evidence showed that, some 3 years after the automobile accident, the respondent was found to have an occlusion of the aorta. He underwent surgery, in the course of which a portion of his terminal aorta was excised and a homograft was transplanted in its place. The two surgeons who performed the operation testified that their gross examination of the aorta revealed a condition of arteriosclerosis, or thickening of the artery and formation of clots, which resulted in an occlusion which obstructed the passage of blood through the aorta. The excised portion of the aorta was submitted to a pathologist, who made gross and microscopic examinations and confirmed this diagnosis.

Within a few days after the operation, it became necessary to amputate the respondent's right leg, due to the fact that blood clots had floated down the femoral artery following the operation and had cut off circulation in the leg.

It is undisputed that the amputation was made necessary as a direct result of the condition which necessitated the aorta surgery.

Each of these doctors expressed the opinion that the occlusion was not caused by a blow which the respondent received in the 1953 accident when the gearshift levers of his truck struck him in the chest and abdomen, but rather was caused by the degenerative disease known as arteriosclerosis.

The testimony of these doctors, however, was not in evidence at the time the respondent's witness, Dr. James, testified. Dr. James' examination of the respondent (which was external rather than internal) had not revealed the presence of arteriosclerosis. The hypothetical question posed to him by the respondent's attorney asked him to assume the facts of the accident—the respondent's head and neck injuries, the treatment given for them, and the symptoms which he later developed in his hips, abdomen, and legs. He was then asked to assume

". . . that he was operated on for a condition diagnosed as an occlusion of the aorta and that this was complicated by a thrombus or thrombosis of his right lower extremity; that he had an artery transplant done with reference to his aorta and his right leg was amputated at the area that you found in your physical examination."

The question followed:

"Assuming all of those facts to be true, Dr. James, can you form an opinion as to the relationship, if any, between the injury described to you on October 6, 1953, and the condition that you diagnosed in the chest and right leg at the time you examined him?"

The doctor answered that it was his opinion that the trauma suffered in the collision was directly responsible for the conditions noted at the time of his physical examination, which were:

"(1) Traumatic crushing injuries of abdomen, aorta, and chest, old; (2) traumatic injury of neck and left shoulder and arm, old; (3) amputation scars of right leg at the junction of the middle and upper third; (4) circulation impairment in the left arm and left leg; (5) post traumatic syndrome."

The doctor was then asked to explain medically what had happened to the respondent, on which he based his opinion. He said:

"Yes, in my opinion the trauma that Mr. Wharton sustained as of his injury of 6th of October, 1953, was in the nature of a crushing injury to the chest and abdomen in that the gearshift levers were forced up into the chest and abdomen just below the breastbone and that such a blow compresses or shoves together between the gearshift lever and the backbone the aorta, which is the biggest artery in the body, and in so doing it bruises that vessel; where the walls are bruised, a resulting scar tissue is formed and over a period of time, this scar tissue contracts, causing or aggravating an occlusion of the aorta so that it interferes with the circulation to the extent that the occlusion has to be removed if possible and cured with an artery transplant; and at that time, at the time of the heart surgery for the occlusion, a blood clot formed known as a thrombosis in the right leg shutting off circulation of the right leg and requiring an immediate amputation of the right leg and that after the patient got over the operation he still had a circulatory deficiency over his entire body, but particularly marked in the left arm and left leg."

The doctor stated that one would not ordinarily find arteriosclerotic changes in a man of respondent's age when making a physical examination of the type he conducted.

It is evident that in arriving at his opinion that the occlusion of the aorta was attributable to the traumatic injury received in the automobile collision, the doctor assumed that the gearshift lever had crushed the aorta, that it was bruised as a result, that scar tissue formed, and that this scar tissue either caused or aggravated an occlusion, with the resulting impairment of circulation. He did not account for the possible presence of occlusion prior to the formation of scar tissue.

There was no evidence that scar tissue had formed inside the artery and caused the occlusion. The only scar tissue observed by any of the doctors involved in the surgery was scar tissue outside the artery, which Dr. Crystal said is always found "around an occluded artery." There was no evidence that the occlusion was the result of anything other than the arteriosclerotic changes in the artery, outside of the

assumption made by Dr. James; and this assumption was a vital and material basis of his opinion. Another assumption made by the doctor, not contained in the hypothetical question, was that the aorta was crushed and bruised. The operating surgeons found no signs of this, and they testified that inasmuch as the aorta lies deep within the abdominal cavity and rests directly on the vertebral column, any injury which would crush and bruise it, would of necessity crush and bruise other organs above it. There was no trace of injury to other organs.

The theory of the respondent, who concedes that arteriosclerosis was present, even though his medical witness did not discover it, seems to be that the injury of 1953 caused an occlusion to form in the diseased artery. His witness did not explain the process by which this could happen if there was no bruise and resulting scar tissue. His attorney attempted to elicit from the other medical witnesses an admission that the occlusion could have developed in this way. However, they were unanimous in the opinion that, while a blow may cause an occlusion in a diseased artery, the occlusion would occur almost immediately, within a matter of days, and the results would be felt in a very short time. The period of three years, which elapsed between the time of the injury and the time it became necessary to remove the occluded portion of the aorta, was too great a period of time to afford room for concluding that this was what happened, according to all of the medical testimony on this subject.

The respondent's witness was not asked to give his opinion on this possibility. This is, therefore, a case in which there is no medical testimony of probative value that would support a finding by the jury that the accident of October 6, 1953, caused the occlusion which resulted in the amputation of the respondent's leg. Such evidence as there was tending to support this contention, was opinion evidence founded on assumptions not contained in the hypothetical question posed or established by the evidence.

I would reverse the judgment and dismiss the action.

HILL and WEAVER, JJ., concur with Rosellini, J.