[No. 38492.     Department Two.     June 22, 1967.]

GUY A. KUSTER, *Respondent*, v. GOULD NATIONAL BATTERIES, *Appellant.**

*Walsh & Margolis,* by *Harry Margolis,* for appellant.

*Levinson & Friedman, Sam L. Levinson* and *Ronald J. Bland,* for respondent.

BARNETT, J.†—This is another products liability case based upon breach of warranty. The necessary purchase of an allegedly defective product was made by the plaintiff, Guy A. Kuster, as an employee of Lipsett Steel Products,

*Reported in 429 P.2d 220.

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

Inc. The item purchased along with four others of the same type was a 6-volt, heavy-duty, lead-acid battery. The purchase was made in December 1961, 14 months before the accident in question. The batteries were made by defendant Gould National Batteries, Inc., and sold in Seattle by Central Sales & Service, Inc.

Lipsett Steel operated a scrap metal processing yard in Seattle and had a diesel-electric crane in which the batteries were used. The plaintiff was a master mechanic in charge of maintaining heavy equipment for Lipsett Steel. He had installed the five batteries in the crane at the time they were purchased and they worked without problem until February 15, 1963. On that day it was necessary to start a diesel-electric switch engine which had "dead" batteries. In order to start the switch engine with power from the crane's batteries the crane was maneuvered alongside the switch engine by Lipsett Steel empolyees, including the plaintiff. When the two pieces of equipment were brought side by side, the plaintiff, while the crane's engine was running, attached one end of a jumper cable to the negative terminal of one of the batteries on the crane and touched the other end of the cable to the crane's metal frame drawing a spark. This procedure was followed for the purpose of determining polarity. About 10 to 15 seconds later one of the cells of that battery exploded. No one was injured by this explosion. Immediately thereafter, the jumper cable was disconnected from the battery which had exploded, the crane's engine was shut off, the knife switch connecting the battery series to the electrical system of the crane was thrown open to break the circuit, and the vent plugs were removed from the cells of all five batteries for the purpose of permitting some of the hydrogen gas (a product of the internal operation of lead-acid batteries) to escape. Approximately 10 to 15 minutes after the first explosion the plaintiff was inspecting one of the cells of a second battery when that cell exploded. This explosion resulted in injuries to plaintiff's right eye.

Judgment was rendered by the trial court sitting without a jury for the plaintiff in the amount of $51,651.44.

The defendant's exceptions to the findings of fact and conclusions of law raise the question as to whether or not there is substantial evidence to support the proposition that the battery explosion causing plaintiff's injury was due to a manufacturing defect.

■ In approaching the problem presented by this appeal we repeat the oft-cited rule that we will not substitute our judgment on disputed evidence for that of the finder of fact, and that our function is to determine whether the findings of the trial court are supported by substantial evidence. *Hollingbery v. Dunn,* 68 Wn.2d 75, 411 P.2d 431 (1966); *Lantis v. Pfarr,* 67 Wn.2d 994, 410 P.2d 900 (1966). In accordance with this rule the evidence as viewed most favorably to the plaintiff will be quoted or summarized.

In regard to the plaintiff's own testimony he states that the batteries worked properly at all times during the 14 months in the crane. He said that the batteries were tested with an ammeter and they always showed normal charge and discharge, and he said the batteries were otherwise looked after and maintained. In his testimony upon cross-examination he indicated he had knowledge that batteries had exploded on occasion and that sparks or excessive heat could cause such explosions. Because of such occurrences, he said that he would not allow torches, fire or welding equipment in the vicinity of batteries. He indicated specifically that the cigarettes of all employees in the area of the batteries had been put out and that he had no tools in his hands except that he held the ends of the jumper cable.

Exhibit 15, a manual on batteries, published by the Association of American Battery Manufacturers, has an informative statement on gas explosions of batteries. This exhibit was introduced into evidence by the defendant and the quoted portion below was read into the record by defendant's counsel in cross-examination of the plaintiff.

The gases issuing from a charging battery are a mixture of hydrogen and oxygen gases and will explode with great violence and spraying of acid if a spark or flame is brought too near them. A room or compartment in which

charging batteries are confined should be ventilated. Do not bring a flame or sparks near vent openings.

In all automotive battery cells small quantities of hydrogen gas are given off at the negative plates even when the cells are not being charged. It must therefore be assumed that explosive mixtures of hydrogen gas are present within the cells at all times. A torch, match flame, lighted cigarette, or sparks from metal tools accidentally contacting the terminals could cause ignition of the gases.

To avoid sparks, do not disturb connections between batteries while charging; first throw switch "Off" at charger. The possibility of ignition of hydrogen gas by static electricity accumulated on the car, or on one's person, and discharging near the vent openings can be minimized if, immediately before working on the battery, a metal rod or wire is touched to the car bumper and to the ground.

Causes of short circuits in batteries are related on page 30 of the manual as follows:

This condition may result from material falling from the plates and being deposited in sufficient quantity to short-circuit the plates at the bottom or edges. Or it may be the result of lead growing ("treeing") from plate to plate through a hole or split in a separator, or a rough edge on a plate may have cut through the separator. Lead may have run down during the lead burning of either the plates to the post straps or the connectors to the posts. Such a "run-down" may not short-circuit the element until later when considerable wear has occurred. One plate or several plates in the element may have "buckled", causing excessive wear and failure of separators resulting in a short circuit of the element.

After the plaintiff testified about the circumstances of the explosion and injury and indicating that some possible external sources of ignition were not present, plaintiff called as an expert witness, Charles V. Smith. Mr. Smith is an owner of Northwest Laboratories, a commercial testing and investigative laboratory. He has a Bachelor of Science degree in chemical engineering and also a Master of Science degree. Mr. Smith has a long history of work in his profession and he testified that he has had experience with and had examined batteries. The following hypothetical

question was asked this witness by plaintiff's counsel. His answer follows:

Q. I am going to ask you a hypothetical question, Mr. Smith, and ask you for the purpose of this question to assume the following facts: That a 6-volt marine type battery, heavy duty type, was approximately fourteen months old, that is, since it was purchased, and was installed in series along with four other batteries of the same make and model on a diesel crane. Assume further that during the preceding fourteen months of service the battery performed without incident.

Also assume that the battery circuit was periodically serviced by checking the voltage regulator and the water level in the battery; and that on the morning of the date in question the batteries were used normally and started normally, and after starting the ammeter on the crane registered approximately 30 amps.

Let's assume further that on the morning in question the battery in the crane started the crane engine which had been idle for approximately twelve hours, and the crane engine operated normally after it started that morning for a period of about ten or fifteen minutes.

Further let's assume that one end of a booster cable was then attached to one of the battery terminals in anticipation of starting up an adjacent switch engine.

Further assume that a test for polarity was then made by the plaintiff, or the person involved, by flipping or just touching one of the alligator clips at one end of the booster cable against the metal frame; and that fifteen or twenty seconds thereafter one of the batteries exploded, blowing off the top of the battery cable.

Assume further that after the first explosion the battery cable was disconnected from the terminal of the exploded battery. The crane engine is turned off. A knife switch is thrown on the crane battery circuit, cutting off all electricity and all connections with any of the crane motor or circuit; and, further, that all the batteries were then vented by the removal of the filler caps from each of the five batteries.

Let's assume further that approximately ten minutes after the first explosion and after the procedure above was completed, a second battery in this series exploded. . . . . That at the time of the second explosion normal activity was observed in battery number five because the

filler caps were off. . . . This is a Gould heavy duty battery described as 9D—it is admitted that it is described as a 9D-G-340. Have you examined such a battery. A. Yes, sir. Q. Have you taken it apart to examine it? A. I didn't dissemble it. I merely examined it through the filler cap to see the internal construction. . . . Q. (by Mr. Levinson) The question again, going back, I asked did you have an opinion; and now I ask you what is your opinion as to the cause of the explosion under these facts? A. It would be internal shorting within the battery, producing a spark or heat great enough to set off the hydrogen and oxygen gases that are formed in the battery during the charging operation.

Mr. Smith continued in his testimony to describe the construction of a lead-acid battery indicating that the type of use a battery would be put to is a factor the manufacturer takes into consideration in the design of a battery and that batteries are built to prevent deterioration from hard usage situations. These are called heavy duty batteries which is the type of battery involved in this case. He stated that if a piece of metal breaks loose, heat or a spark can be produced by the piece of metal bridging the positive and negative plates of a battery and conducting electricity between them. (Hydrogen gas ignites at about 600 or 700 degrees Fahrenheit and a spark is about 6000 degrees.) He also stated that deterioration of the interior plates and grids is caused by ordinary use of the battery but that natural use would cause "A minute amount of deterioration, but not sloughing off." and that it would not be normal if the lead plates were properly manufactured for a dislodging to cause a short. Mr. Smith responded to the following questions on direct examination.

Q. (by Mr. Levinson) Let me ask you this. What is a probable cause of an explosion of this type which was described to you in the hypothetical question, taking into consideration all of the facts that I gave you? MR. MARGOLIS: The same objection continues. THE COURT: Overruled. A. Dislodged material would be the most probable. Q. (by Mr. Levinson) From your experience, what is the cause of this dislodged material, taking into consideration the age of this battery, the type and circumstances under which it was being used and under

which it was being maintained? A. Just falling away of a part of a plate or part of a grid. Q. What would cause that falling away of a part of the grid? MR. MARGOLIS: I think the witness has already answered the question. THE COURT: Overruled. You may answer. A. Well, if there were defective manufacturing in it, then naturally some loosening of the material would be caused by that. There is some natural deterioration in a battery with use that causes separating of the material from the grid. Q. (by Mr. Levinson) In your experience is there enough natural deterioration to cause a short of this type? A. Occasionally, I think so, as the battery gets older. Perhaps not for a fourteen months old battery. Q. That is the point. Let's reframe that question. In your experience is there enough natural deterioration in a battery which is fourteen months old and which has been properly serviced and cared for, sufficient to cause an internal spark? A. It shouldn't be. I wouldn't think so. Q. Mr. Smith, let me ask you just one more question. Absent any defective manufacture of a battery of this type, and taking into consideration this particular battery, the way it was used, a battery which is fourteen months old at the time of the explosion, and taking into consideration the proper care by reason of seeing that it had proper water at all times, and proper charging, checking the voltage regulator at all times,—would there be any explosion, within your experience, absent an improper manufacture of the plates? A. No, not normally at all.

George L. Henderson was called as an expert witness in behalf of the plaintiff. He is a professional engineer, having obtained a Bachelor of Science degree in mechanical engineering and is vocationally occupied as a consulting engineer. Mr. Henderson was asked substantially the same hypothetical question as propounded to Mr. Smith as quoted above. Mr. Henderson's response was that:

The probable cause of the explosion is the reaction between oxygen and hydrogen. The reason that the oxygen and hydrogen exploded or reacted, in the absence of any outside agency to set it off, would be due to an internal happening that would cause the hydrogen to reach the flame point.

Mr. Henderson also testified that sloughing off or breaking of the grid so that it intermittently touched would not occur if it was properly manufactured.

James H. Miller, an employee of the defendant, was called by the defendant as an expert witness. Parts of his testimony on cross-examination are quoted as relevant to the issues at hand. On the existence of hydrogen in batteries the following exchange is pertinent.

Q. Is it a fair statement to say that you must assume that explosive mixtures of hydrogen gas are within batteries—within the cells at all times? Is that a fair statement? A. I think it is a safe assumption to make, yes. . . . Q. You wrote this manual, didn't you, or assisted in writing this manual? I will ask you to turn to page 28 of the manual,—MR. MARGOLIS: This is Exhibit 15? MR. LEVINSON: Exhibit 15, yes. Q.—where it says, "Battery Gases Explosive," and the second paragraph: "In all automotive battery cells small quantities of hydrogen gas are given off at the negative plates even when the cells are not being charged. It must, therefore, be assumed that explosive mixtures of hydrogen gas are present within the cells at all times." You agree with that, don't you? A. Yes. Q. As far as engineers are concerned, whether the public knows it or not, there is always an explosive mixture inside of these cells? A. It says we assume that there may be. Q. Is that assumption based on your experience? A. Yes, sir.

Mr. Miller also testified about defectively manufactured batteries.

Q. It is possible, is it not, with a firm who manufactures some six million of this type of battery a year, that even though it was properly designed, some of them don't come out the same as their design? A. I'm sure that is true. Q. And for that reason you have various stages of inspection in the manufacturing process? You try to meet the design standard? A. That is correct. Q. And even despite this inspection, once in a while a bad battery gets out, doesn't it? A. I think that is probably true also. . . . Q. Within the experience of your company you have had batteries explode before, haven't you? A. Yes, sir. Q. Do you know the causes of those explosions? A. Various reasons. Q. Have you ever had any where it was caused by some internal cause in the battery itself? A. Yes, sir. Q. Have you ever had any where it was caused by a defect in the battery? A. What do you mean, by a defect? Q. Something wrong in its manufac-

ture. A. Yes, sir. Q. They have exploded because of that, haven't they? A. Yes, sir.

Mr. Miller was examined by plaintiff's counsel about various manufacturing defects.

Q. It sometimes happens that the separators are defective and the grids are open? Once in a while that happens? A. That is right. Q. And if the separators were broken and something drifted down, as things sometimes do, it could drift in this fluid and get caught on this hole in the separator and another plate and it makes a contact between the two? That is possible, isn't it? A. Certainly it is. Q. If that is possible, then of course if there is any free hydrogen gas around, you have an explosion, don't you? A. If it is an explosive mixture you probably would, yes. Q. That can happen no matter how well designed your battery is if it was not exactly manufactured the way you designed it? A. I suppose so.

And finally, on short circuits in batteries.

Q. . . . . Is it a fair statement to say then that whenever anybody has a battery we must assume it contains an explosive mixture at all times? A. It could, yes. Q. Whether the customer knows it or not, at least the manufacturer knows it? A. That is correct. Q. Short circuits do occur inside batteries, don't they, sometimes? A. Sometimes. Q. When they occur inside batteries, if they occur with a condition of free hydrogen gas, you have an explosion? A. If you have an explosive mixture, yes. Q. What are some of the things that might cause a short circuit inside a battery cell? A. Offhand I can think only of one, and that is mechanical defect.

■ One of the defendant's contentions is that plaintiff's expert opinions have no probative value because facts consistent with the defendant's theory of the case, *i.e.*, an outside source of ignition, were not included in the plaintiff's hypothetical questions. There is no merit to this contention. We quote from *Wharton v. Department of Labor & Indus.*, 61 Wn.2d 286, 289, 378 P.2d 290 (1963) which makes a complete disposition of the argument.

The gist of the appellant's argument is that the hypothetical questions propounded to Dr. James by the respondent's counsel did not embrace the proofs that were afterwards made by the appellant. The argument com-

pletely overlooks the fact that neither the appellant's counsel nor the counsel for the respondent's employer (who participated fully in the proceeding) cross-examined Dr. James as to whether his opinion would be changed or not if the facts subsequently developed by the appellant were taken into account. It was perfectly proper for appellant's counsel to embrace such facts within hypothetical questions to be propounded by them in their cross-examination of Dr. James, but they did not do so. Under this state of the record, the applicable rule was stated in *Wilson v. Pacific Power & Light Co.*, 171 Wash. 232, 17 P. (2d) 846, as follows:

"At the time that the question was propounded, there was no evidence that irrigation water from other lands might be the cause. It was proper for respondents to frame the hypothetical question upon the theory of their case and under the evidence introduced by them. *Griggs v. Wayne*, 100 Wash. 459, 171 Pac. 230; *McEachran v. Rothschild & Co.*, 135 Wash. 260, 237 Pac. 711, 241 Pac. 969. Furthermore, appellant's counsel was privileged to, and did, upon cross-examination, bring to the attention of the witness the very element which it now claims was omitted from the original question, and received an unfavorable answer to his question. The assignment is not well taken."

Nor is there any merit in the appellant's contention that it was necessary for the respondent to include, in the hypothetical questions submitted to Dr. James, the facts which were subsequently developed in the appellant's proof. It is necessary that the hypothesis include only the facts developed by the respondent's own evidence. *Wilson v. Pacific Power & Light Co.*, *supra; McEachran v. Rothschild & Co.*, 135 Wash. 260, 237 Pac. 711, 241 Pac. 969; and *Griggs v. Wayne,* 100 Wash. 459, 171 Pac. 230.

The plaintiff's theory of the case is that a lead-acid battery in use for only 14 months and which has been properly cared for and serviced would not ordinarily explode without a manufacturing defect, and that this manufacturing defect caused the explosion. The hypothetical questions propounded to the two witnesses called by the plaintiff as experts were fair questions based upon the evidence presented by the plaintiff. The answers given to the hypothetical questions are of probative value. The idea that static

electricity was a possible source of ignition was put in evidence by the defendant in its cross-examination of the plaintiff, but in accordance with the *Wharton* case, *supra,* and cases cited therein, the lack of this element in the plaintiff's hypothetical questions does not mean the responses to them have no evidentiary value. We note that the defendant's counsel in his cross-examination of the plaintiff's witnesses did not embrace facts consistent with defendant's theory of the case in a hypothetical question. We note too that plaintiff's testimony did indicate precautions were taken by the plaintiff and other employees to prevent an explosion of the batteries by external ignition. Furthermore, the only testimony on static electricity as an external source of ignition came from plaintiff's witness Smith on cross-examination by the defendant's counsel. "Q. It could be possible that static electricity would set it [the explosion] off? A. Possibly."

The defendant next argues that static electricity is a possible external source of ignition as pointed out in the first passage we quoted from exhibit 15 at page 476 of this opinion, and this source has not been reasonably ruled out by the evidence. Thus, concludes the defendant, there is a gap in the evidence of a defect in the battery causing the explosion. It relies heavily upon *Prentice Packing & Storage Co. v. United Pac. Ins. Co.*, 5 Wn.2d 144, 106 P.2d 314 (1940) as stating rules of circumstantial evidence which bar plaintiff's recovery in the present case for failure of proof. In the *Prentice* case, *supra,* the suit was brought due to the bursting of an ammonia pipe in a cold storage plant. The insurance policy limited plaintiff's right of recovery to losses caused by the pressure of the refrigerant and excluded all other causes. Two witnesses evolved the theory that due to some inherent or acquired flaw in the metal pipe a microscopic crack had developed. They further testified that if this was the case such a rupture would manifest itself by a telltale leakage of ammonia. There was no evidence of a leakage of ammonia; therefore, there could be no inference that a crack existed. The court said there was a missing

link in the evidence as there was no evidence of a defect in the pipe. The court then held that such a lack of evidence could not be overcome by an assumption of a condition necessary to establish the cause of action without any evidence to support the assumed fact.

This is not the present case. Here there is positive testimony by the plaintiff of the care taken by him to avoid an outside spark, that he was aware of the danger of explosion, that welding equipment, torches and fire were always kept away from batteries, and that no employee of Lipsett Steel had lit a cigarette in the vicinity of the batteries when either exploded.

■ The defendant seems to argue that the burden is cast upon the plaintiff to exclude all probable or possible causes of ignition other than a source inside the battery in developing his case, for it states in its brief:

> Considering the activity going on at the time, and the obvious presence of hydrogen gas which had to be above the plates and above the level of the water for a combustible concentration to exist, static electricity as a cause of one or both explosions is at least a reasonable possibility or a probability as a source of ignition. That source of ignition has never been ruled out of the case, . . . .

It is the law that the plaintiff must establish with reasonable certainty a manufacturing defect as a cause of the accident in order for him to recover damages from the defendant. In attempting so to do, if the evidence shows that the injury is equally or else with reasonable certainty attributable to other probable causes, he must also exclude such other causes. But in so doing he is not compelled to meet conjecture or mere possibilities with proof to the contrary. *Kantonen v. Braley Motor Co.,* 176 Wash. 577, 30 P.2d 245 (1934); *Sommer v. Yakima Motor Coach Co.,* 174 Wash. 638, 645, 26 P.2d 92 (1933). In the *Sommer* case, *supra,* it was argued by the appellants that

> [I]n proving a case by circumstantial evidence, it is not sufficient merely to show that there were causes for which the other party could be liable and which *could* have produced the injury, but there must be a showing that the injury could not have been produced in any

other manner, or could not have been produced in a manner for which such party would not be liable.

However, this court did not agree with such a contention concerning burden of proof and said at 645:

That such is the rule in the abstract it may be conceded, but the rule is not so extensive or so rigid as to require the exclusion of every possibility, whether it be an active cause or a mere condition.

In the present case the record does not disclose any probable cause other than that testified to by the plaintiff's experts. Concededly, witness Miller testified that in his opinion the explosion was not caused internally and he also testified that the source of a battery explosion "can come from a number of different places. Externally it can come from a spark, cigarette, static electricity. Internally it can come from a spark." However, defendant's counsel never propounded to his expert a hypothetical question describing the physical facts as testified to by the plaintiff and elicit an answer that in those circumstances the ignition from outside sources was the probable cause of the accident. If believed, the plaintiff's evidence does show that some possible external sources of the ignition are ruled out. The only external source which defendant suggests as perhaps causing the ignition is static electricity and the record indicates it has no more substantiation than a mere possibility which requires no rebuttal by the plaintiff.

Upon the physical facts presented by the evidence, the question of producing cause resolved itself into a conflict between expert opinions. We are satisfied that there was substantial evidence to sustain the findings of the trial court.

The judgment is affirmed.

FINLEY, C. J., HUNTER and HAMILTON, JJ., concur.