EDWIN E. WILKINS, *Respondent*, v. GRAYS HARBOR
COMMUNITY HOSPITAL, *Appellant*.*

*Parker & Parker, Paul O. Manley*, and *Lester T. Parker*,
for appellant.

*Vance, Davies, Roberts & Bettis (John M. Darrah*, of
counsel), for respondent.

BARNETT, J.†—On the 14th day of May, 1962, the defendant entered into a medical service contract with Grays Harbor Veneer Corp. This contract is best described as a standard nonindustrial medical service agreement. The defendant has such agreements with business firms in the

*Reported in 427 P.2d 716.

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

community and employees purchase coverage by authorizing deduction from their wages.

The plaintiff in this case was about 55 years old when he went to work for Grays Harbor Veneer Corp. in June, 1962. He was a person who moved about, not putting down roots in any one community. In his earlier years he followed the wheat harvest through Nebraska, Kansas and the Dakotas. During the war he worked in shipyards in Seattle, Pearl Harbor and in California. After the war he shipped out as a merchant seaman until about 1956, at which time he began working for a Portland milling company. Subsequently, the plaintiff moved to the Grays Harbor area and found jobs as a longshoreman and construction laborer until he began full time employment with Grays Harbor Veneer Corp. At this time plaintiff agreed to coverage by said medical contract and authorized the wage deductions. His coverage was begun as of June 1, 1962.

In the first half of July 1962, the plaintiff began experiencing noticeable stomach disorders. On July 14, 1962, he saw Dr. Baker in Aberdeen for the first time in connection with this stomach problem. (Dr. Baker had treated and even hospitalized the plaintiff for severe back pain in April 1962.) Dr. Baker continued his treatment of the plaintiff's stomach disorder to March 1963. In that month the plaintiff injured his foot and was treated by Dr. Vegh, who was associated with Dr. Baker. Dr. Vegh took over treatment of plaintiff's stomach disorders and by August 1963, had hospitalized the plaintiff on three separate occasions. In the month of August 1963, Dr. Vegh requested authority from the defendant for exploratory surgery under the medical service contract provisions. This request was denied. The plaintiff received treatment elsewhere and was operated on in the King County Hospital on April 21, 1964, at which time cancerous tissue in the stomach and esophagus was removed. The plaintiff filed a complaint against the defendant for breach of contract and by amended prayer sought damages in the amount of $125,000. A jury returned a verdict of $43,734 for the plaintiff and a judgment upon the verdict was entered.

The defendant appeals from the judgment, presenting 4 questions based upon 10 assignments of error for this court's resolution. These questions are: (1) Did the plaintiff's condition pre-exist coverage by the medical service contract? (2) Had the plaintiff received all the services under the contract he was entitled to prior to August 1963, when his request for exploratory surgery was denied? (3) If there was a breach of contract, should plaintiff's recovery be limited to medical and hospital expenses incurred in the continued treatment of his condition, thereby denying him any recovery for pain and suffering and other damages resulting from the delayed operation? (4) Was there sufficient evidence that plaintiff's condition worsened during the period from the denial by the defendant of the requested surgery in August 1963, to the time he was operated upon in April 1964?

■ In considering the defendant's challenges to the sufficiency of evidence, we keep in mind that the evidence and all inferences therefrom are to be taken in favor of the plaintiff-respondent. *Osborn v. Chapman,* 62 Wn.2d 495, 384 P.2d 117 (1963).

In answering the first question posed by the defendant, we take note of the pertinent circumstance as portrayed in the record. Dr. Baker had hospitalized the plaintiff for back pains in April 1962, which is just prior to the date of the instant contract and there is no evidence from Dr. Baker that plaintiff complained of stomach problems at that time. Plaintiff testified that his stomach first started to bother him "like I was having indigestion," a week or so before going to see Dr. Baker in July 1962. Dr. Baker had no record of such complaints prior to that time. The plaintiff continued seeing Dr. Baker and continued working at Grays Harbor Veneer Corp. until December 1962, when Dr. Baker recommended that he leave work for several months. After staying off the job for awhile Dr. Baker allowed him to return, but he was able to work only a short time.

The defendant argues that Dr. Baker had expressed an opinion that plaintiff's condition had arisen 18 months prior

to August 8, 1963, hence this proves the condition predated the contract and not covered thereby. This argument has reference to Dr. Baker's consultation report dated August 8, 1963, which is worded as follows: "This patient with epigastric pain, gas, distress, and heartburn for past 18 months with long periods of time loss from his job has recently had gastric hemmorhage [sic.]." However, this testimony is only an approximation on the part of Dr. Baker and is not substantiated in his own notes. This was pointed out on cross-examination by plaintiff's counsel as indicated by the following exchange:

Q. Now at this time, when you first saw him in April of '62, did he have any complaints, or do your records indicate any complaints as to heartburn or gastric acidity? A. When I first saw him his complaints were referable to his low back problem, and I don't recall—I have no record at least of his complaints of heartburn at that time. Q. You don't have any recollection of it outside of your notes either, do you Doctor? A. No. Q. Now, when you wrote up the report of August or '63, Doctor, and when you put 18 months of heartburn, I take it this was just a rough estimate from what you knew of Mr. Wilkins? A. Yes, it was on that order. It was an approximation.

It was within the province of the jury to evaluate Dr. Baker's testimony and come to a decision by considering all the evidence adduced.

Several friends of the plaintiff testified about their knowledge of his health. One, a resident of the same rooming house in Aberdeen as the plaintiff, testified that the plaintiff appeared to be in good health prior to working for Grays Harbor Veneer Corp., and only started complaining about stomach problems some two or three weeks after he started working for Grays Harbor Veneer Corp. A second friend of the plaintiff, who had known him over two decades and had last seen him in the spring of 1962, testified that he was in good health and had not complained about his stomach at any time including their last meeting.

The contract provision pertinent to this inquiry reads as follows: "SECTION IV LIMITATIONS AND EXCLUSIONS (A)

The care, services and other benefits herein provided are limited to medical treatment for illnesses and injuries occurring within the period the subscriber has been covered under this agreement."

■ To guide the jury in its determination as to whether or not the condition of the plaintiff pre-existed the contract, the court gave the following instruction which became the law of the case since no exception was interposed thereto:

> Under the contract between the Plaintiff Wilkins and the Defendant hospital, the hospital was under no obligation to furnish any medical or hospital treatment for any diseased condition of Plaintiff that occurred prior to the date of the contract coverage, which date was June 1, 1962. Such a diseased condition is referred to as "pre-existing", and one of the reasons given by the hospital for denying the surgery in question was that the Plaintiff's condition pre-existed the date of coverage.
>
> Under the law, an illness or disease is deemed to "occur" when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can, with reasonable accuracy, diagnose the disease. The presence of germs in a body does not cause a disease to occur so long as they are only latent, inactive, and not discoverable. (Instruction No. 7.)

As heretofore stated, this instruction became the law of the case and by the overwhelming weight of authority it is a correct statement of the law. See 53 A.L.R.2d 686 (1957); 10 Couch, Insurance § 41:814 (2d ed. 1962), wherein it is stated:

> That is, it is generally recognized that provisions in a health or hospital insurance policy requiring that the illness or disease from which the insured suffers originate a specified time after the date of the policy to be within the policy coverage are strictly construed against the insurer, and the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease.

We are convinced the record in this case is sufficient to support a determination by the jury that plaintiff's condition did not pre-exist the execution of the contract. The jury was entitled to find that plaintiff's illness became manifest after the time he became a party to the contract.

*Schultz v. King Cy. Medical Serv. Corp.*, 24 Wn.2d 432, 165 P.2d 857 (1946), cited by the appellant, is inapposite; it involves a dissimilar contractual provision. We note that the instant contract refers only to illness occurring within the period of coverage, whereas, the King County contract specifies pre-existing sicknesses whether patent or latent which may have originated or existed prior to the coverage.

The defendant asserts another defense to plaintiff's suit on the medical service contract; that the plaintiff had received 12 months of medical service under the contract, thus was entitled to no more services. The appropriate contractual provisions provide:

SECTION II MEDICAL-SURGICAL

(a) Medical and surgical treatment and diagnosis as reasonably required shall be furnished by any physician or surgeon, being a member of the Active Staff of the Grays Harbor Community Hospital, to be chosen by the subscriber. To obtain treatment, subscribers are to sign a "Request for Treatment Ticket" at the physician's office.

(b) Services by the physician shall include office and hospital visits. Home calls to any place not more than five (5) miles from the city limits of the city in which the office of the participating physician making the call is located. The patient will be responsible to the doctor for any extra mileage beyond the five mile limit.

(c) General medical and surgical services will be provided for twelve (12) separate calendar months for any one condition. Any service rendered under this contract in any calendar month shall be one month's service.

SECTION III ADDITIONAL BENEFITS

. . . .

(b) Out-patient prescriptions excluding vitamins and hormones will be filled at such places as the Association Management may designate. The Association will provide

prescriptions up to $50.00 for one person within a calendar year but not to exceed $50.00 for any one condition.

. . . .

SECTION IV LIMITATIONS AND EXCLUSIONS

. . . .

(c) Medical-Surgical care limited as set forth on Page 2, Section II, Paragraphs (a), (b) and (c).

(d) Prescriptions limited as set forth on Page 2, Section III, Paragraph (b).

The facts are not in dispute. The plaintiff was first treated by Dr. Baker under the contract in July 1962. There was no contact between the plaintiff and any doctors under the contract in August 1962. In September and December 1962, and from January through July 1963, in each month, Drs. Baker and Vegh continued their treatment of the plaintiff. In the months of October and November 1962, the plaintiff only received refill prescriptions written or called in by Dr. Baker. No doctor's charge was made to the hospital for the prescriptions, however, the drugs so prescribed were paid for by the hospital.

The trial court held as a matter of law that there was no evidence that the defendant hospital furnished medical care or services for 12 separate months for this one condition within the meaning of the contract, and withdrew the issue from the jury.

■ We agree with and adopt the trial court's construction of the contract which reads as follows:

If there is any ambiguity or question about the meaning of it, it must be construed most strongly against the party who wrote it. Now Section 2, I was prepared to instruct the jury, if it was necessary, that medical care and services under the contract means services furnished by a physician, and in determining whether the hospital furnished any medical care or service in any given calendar month, the test is whether during that calendar month the physician, the plaintiff's physician, furnished any medical care or service to the plaintiff which the hospital was required to pay and did pay. If the doctor furnished some service gratuitously, the hospital can not invoke the twelve months' treatment and take advantage of it. It must be service rendered by the hospi-

tal through the physician. And the contract is broken up into sections, and Section 2 says: "Medical-Surgical"— "Medical and surgical treatment and diagnosis as reasonably required shall be furnished by any physician or surgeon being a member of the Active Staff of the Grays Harbor Community Hospital to be chosen by the subscriber. To obtain treatment subscribers are to sign a 'Request for Treatment Ticket' at the physician's office." In the same section, same paragraph, same section, under "Medical-Surgical, (b) Services by the physician shall include office and hospital visits." Then there is a five mile out of the city limits—There is a limitation and so on. Under the same section, (c) "General medical and surgical services" and that is the expression that has been used earlier, "will be furnished for twelve separate calendar months for any one condition. Any service rendered under this contract in any calendar month shall be one month's service." It is in the same paragraph, under the same subsection. It obviously must refer to Section 2. Now the next one, where the drugs—that section, doesn't say "benefits in lieu of", it says "additional benefits", drugs. Then in Section IV under "c", Exclusions, one of the exclusions, or one of the references is "c" Medical-Surgical care limited as set forth on page 2, Section II, Paragraphs (a), (b) and (c). This gets a little technical, but these things do become technical. And the defendant wrote the contract. I will find that as a matter of law that there is no evidence that the defendant hospital furnished medical care and services within the meaning of the contract for this one condition for a period of twelve separate calendar months, and that issue will be withdrawn from the jury.

The next question to be resolved involves the rules of foreseeability of damages in contract actions. The defendant contends that there is nothing in the contract which could be remotely construed to indicate that when the parties entered into the contract they contemplated damages for breach of such contract other than the cost of the services which the defendant should have furnished except for the breach.

In this case the total verdict was in the amount of $43,734. The proven medical expenses were $3,734. The defendant argues the only possible verdict is $3,734. It avers

that the contract does not contemplate damages for pain and suffering and other general damages.

We note that the contract contains no provision which limits damages in the event of a breach and the parties did not liquidate the damages. This is a contract between an industrial firm and a hospital and the plaintiff's premiums were paid as an incident to his employment. The evidence shows that the plaintiff had no funds to pay for hospitalization or other medical services.

 This court has announced that damages for breach of contract can be recovered only for such losses as were reasonably foreseeable by the party to be charged at the time the contract was made or if the injury was not foreseeable, then it must specifically be shown that the defendant had special knowledge of the risk he was undertaking. *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 7, 390 P.2d 677 (1964). In the *Larsen* case we quoted with approval from 5 Corbin, Contracts § 1009:

"The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation . . . but in general damages are awarded for a breach not because they were contemplated and promised to be paid, but to compensate the injured party for harm done that ought to have been foreseen whether it was or not."

In a case not cited in the briefs, the Supreme Court of the State of Oregon construed a similar medical service contract. In *Coffey v. Northwestern Hospital Ass'n.* 96 Ore. 100, 102, 183 Pac. 762, 189 Pac. 407 (1919), part of the contract is set out, and we quote the part therefrom:

"Class B. Contract No. 5204.
"Northwestern Hospital Association of the State of Oregon.

"In consideration of a membership fee of One Dollar, and of Fifty Cents a month dues, the Northwestern Hospital Association of the State of Oregon, hereby agrees to care for Mrs. C. W. Dennis, residing at Portland, Oregon, in case of sickness or accident, by furnishing her with Medical, Surgical and Hospital Services, as provided

herein. This agreement is entered into, upon the consideration that the member shall strictly comply with her part of the provisions and conditions herein contained, or endorsed hereon. . . ."

In denying a petition for rehearing challenging the award of damages which included physical pain and mental suffering, the Oregon court said at 118:

We are of the opinion that the damages suffered here may be fairly said to have been within the contemplation of the parties when the contract was executed.

It is a well-known fact that as a rule these contracts are not entered into by the wealthy or well-to-do class of the community, but by that poorer class who seek thereby to provide themselves with medical or surgical assistance in case of sickness or accident, without resort to humiliating public or private charity. That a resort to such charity might result from a failure of defendant to keep its contract, was a contingency which would naturally be within the contemplation of both parties. That being compelled to resort to it for the meager assistance it usually affords would be a source of humiliation and mental anguish to a woman of average sensibilities, who for years had paid a monthly premium to avoid such a contingency, goes without saying.

As in the Oregon case, we are of the opinion that increased pain and suffering and detrimental changes in one's health are certainly a reasonable foreseeability from a breach of this medical service contract by denying treatment under it.

The defendant relies upon *Carpenter v. Moore*, 51 Wn.2d 795, 322 P.2d 125 (1958). We do not deem *Carpenter* controlling. That suit was predicated upon a promise to do work to the satisfaction of the patient. The instant case is based upon an entirely different factual pattern from which pain and suffering are reasonably foreseeable.

Finally, we consider the defendant's contention that there was insufficient evidence to demonstrate that the plaintiff's condition worsened during the period from the denial of the request for surgery, August 8, 1963, to the time of the operation, April 21, 1964. Dr. Vegh had recom-

mended surgery in August 1963. The defendant refused the requested surgery. The plaintiff had no funds with which to purchase medical treatment and hospitalization. For that reason he was sent to the state office of vocational rehabilitation to obtain the needed treatment. This office sent him to various specialists for diagnosis and treatment. Plaintiff cooperated in these examinations, and, as a result, the operation was performed after a delay of 8 months.

When the operation was finally undertaken three-quarters of plaintiff's stomach was removed as were lymph nodes and 5.5 centimeters of the lower portion of his esophagus. At the time of the operation the cancer had completely gone through the stomach wall into tissues behind and up the esophagus about three centimeters. Removing part of the esophagus also required the removal of the cardio-esophageal junction which is a "valve mechanism" between the stomach and the esophagus.

The evidence indicates that the cancer began in the stomach, growing outward, and at the time of the operation was extended into the esophagus and had destroyed the function of the cardio-esophageal junction and caused serious disability and pain. Dr. Johnson, one of the doctors who participated in the diagnosis of the plaintiff at the King County Hospital, gave the following answers to questions asked by plaintiff's counsel on direct examination:

Q. You had stated that your diagnosis was that the tumor was probably primary to the stomach. Did your operation confirm this diagnosis? A. Yes, it did. Q. And you feel certain that the cancer did originate in the stomach? A. Yes. There is no doubt about that. It was a large mass which was in the stomach and a small extension relatively up into the esophagus; but it was primarily into the stomach.

Dr. Johnson also stated in response to a question by plaintiff's counsel as to whether the tumor in the plaintiff grew substantially in the period from August 1963, to April 1964: "Oh, I think there is no doubt that it grew during that time." This assertion that the cancer had grown in the period between August 1963, and April 1964, is supported

by the evidence in connection with the damage to plaintiff's esophagus.

The first problem plaintiff had with his esophagus was brought to Dr. Vegh's attention in March 1964. Prior to December 5, 1963, when Dr. Vegh last saw the plaintiff, there had been no such complaint by him to Dr. Vegh about his esophagus. The inferential conclusion that the cancer had not reached and affected plaintiff's esophagus is buttressed by the records of the King County Hospital (exhibit 3) and by the absence of such complaints reflected in the testimony of Dr. Baker or in the records of the defendant hospital. Dr. Johnson opined that if these complaints originated in December 1963, it would indicate that the cancer at that time had grown to and destroyed the "valve mechanism" of the cardio-esophageal junction.

The loss of the cardio-esophageal junction is permanent and could not be reconstructed or compensated for by surgery; the result is that stomach acids reflux into the esophagus irritating its mucous membrane and producing pain and sleeplessness.

Another aspect of damage resulting from the delay in surgery caused by defendant's breach of contract is a reduction of plaintiff's chances for survival. Testimony on this matter was presented by Dr. Vegh, and Dr. Barrett, another physician who participated in the treatment of the plaintiff at King County Hospital, and Dr. Johnson. Dr. Vegh was questioned concerning the effect of the delay by plaintiff's counsel:

> Q. Is it more likely than not that Mr. Wilkins was damaged because of this delay? A. Now knowing that he had malignancy—all malignancies get better result of the treatment—from this medical rule I assume he had better chance if we do the surgery early, if the surgery [is] performed earlier. Q. And Doctor, just in what way? When you say "better chance" a better chance of what, Doctor? A. Better chance of the cure, better chance of the cure.

In the same vein is testimony by Dr. Beach Barrett in reply to plaintiff's counsel:

Q. Now is there any possibility of your estimating for us what Mr. Wilkins' chances were eight months prior to the time this operation was performed? A. No. We just don't have such figures, except that we know his chances eight months earlier were better than they were when the operation was done, because a cancer runs a relentless progression, from one stage to another. . . .

Due to the peculiar growth characteristics of cancer in the human body the prognosis for the plaintiff's complete cure was pessimistic. Dr. Barrett stated in his testimony:

Well, I would say that there is probably a greater than even chance that he still does have, and that it will become manifest within five years of his operation. Each year that goes by without any evidence of it is certainly in his favor, and actually it is unusual that anyone who had symptoms as long as he did is even still alive, so one would hate to put a figure on it. But there is certainly a significant chance that he will still show up with a recurrence.

Which was followed by this question of plaintiff's counsel:

Q. When we say significant, are we talking about a likelihood, a medical likelihood? Is it more probable than not that this will occur? A. It is definitely more probable than not, based on what studies we have to go on.

Dr. Johnson also prognosticated at the trial on plaintiff's cure:

I would say from every criteria that we usually think of regarding prognosis, he has a very poor outlook. The fact that his tumor was large, that it infiltrated throughout the entire wall of the stomach and presented on the external surface, the fact that lymph nodes were involved, although only one was—. The fact that the microscopic appearance of the tumor was that of what we call an undifferentiated carcinoma, which means that it grows more rapidly and that patients with this kind of lesion generally do not survive as long as those with a more well differentiated tumor. So that by all the usual criteria his prognosis is very poor. On the other hand we know of no recurrence of his tumor at this time. And this is certainly very favorable.

We deem the evidence amply sufficient to justify a conclusion by the jury that the plaintiff has been permanently

damaged as a result of defendant's breach of contract. Furthermore, we are of the opinion that the evidence with reference to damages is not speculative or conjectural.

The judgment is affirmed.

FINLEY, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.

[No. 38553. Department One. May 4, 1967.]