[No. 44078. En Banc. January 20, 1977.]

JAMES M. GAYLORD, *Appellant*, v. TACOMA SCHOOL DISTRICT NO. 10, ET AL, *Respondents*.

*Peterson, Bracelin, Young & Putra*, by *Christopher E. Young*, for appellant.

*Don Herron, Prosecuting Attorney*, and *Roger J. Miener, Deputy*, for respondents.

HOROWITZ, J.—Plaintiff–appellant, James Gaylord, appeals a judgment of the trial court upholding Gaylord's

discharge from employment as a high school teacher by defendant school district. A prior appeal resulted in a remand to the trial court to enter new findings based upon application of the proper statutory burden of proof of the district. *Gaylord v. Tacoma School Dist. 10,* 85 Wn.2d 348, 535 P.2d 804 (1975). The case now before us is an appeal from the judgment entered on new findings and conclusions entered by the trial court on remand.

Defendant school district discharged Gaylord—who held a teacher's certificate—from his teaching position at the Wilson High School in Tacoma on the ground of "immorality" because he was a known homosexual. Gaylord appealed this decision to the Superior Court for de novo trial under RCW 28A.88.015. The court after trial entered findings, conclusions, and judgment to the effect there was sufficient cause for discharge. Gaylord then appealed the Superior Court judgment to this court which in turn remanded the cause back to the Superior Court for further consideration. It had erroneously construed a statute to require it to give special weight to the testimony of school personnel. *Gaylord v. Tacoma School Dist. 10, supra.* On remand reconsideration, the Superior Court concluded in substance Gaylord was properly discharged for immorality because he was homosexual, and as a known homosexual, his ability and fitness to teach was impaired with resulting injury to the school. Gaylord again appeals to this court assigning error to various findings, conclusions, and judgment.

We need consider only the assignments of error which raise two basic issues: (1) whether substantial evidence supports the trial court's conclusion plaintiff–appellant Gaylord was guilty of immorality; (2) whether substantial evidence supports the findings, that as a known homosexual, Gaylord's fitness as a teacher was impaired to the injury of the Wilson High School, justifying his discharge by the defendant school district's board of directors. The relevant findings of the trial court may be summarized as follows.

Gaylord knew of his homosexuality for 20 years prior to his trial, actively sought homosexual company for the past several years, and participated in homosexual acts. He knew his status as a homosexual, if known, would jeopardize his employment, damage his reputation, and hurt his parents.

Gaylord's school superior first became aware of his sexual status on October 24, 1972, when a former Wilson High student told the school's vice–principal he thought Gaylord was a homosexual. The vice–principal confronted Gaylord at his home that same day with a written copy of the student's statement. Gaylord admitted he was a homosexual and attempted unsuccessfully to have the vice–principal drop the matter.

On November 21, 1972, Gaylord was notified the board of directors of the Tacoma School Board had found probable cause for his discharge due to his status as a publicly known homosexual. This status was contrary to school district policy No. 4119(5), which provides for discharge of school employees for "immorality." After hearing, the defendant board of directors discharged Gaylord effective December 21, 1972.

The court found an admission of homosexuality connotes illegal as well as immoral acts, because "sexual gratification with a member of one's own sex is implicit in the term 'homosexual.'" These acts were proscribed by RCW 9.79-.120 (lewdness) and RCW 9.79.100 (sodomy).

After Gaylord's homosexual status became publicly known, it would and did impair his teaching efficiency. A teacher's efficiency is determined by his relationship with his students, their parents, the school administration, and fellow teachers. If Gaylord had not been discharged after he became known as a homosexual, the result would be fear, confusion, suspicion, parental concern, and pressure on the administration by students, parents, and other teachers.

The court concluded "appellant was properly discharged by respondent upon a charge of immorality upon his

admission and disclosure that he was a homosexual" and that relief sought should be denied.

Was Gaylord guilty of immorality?

Our concern here is with the meaning of immorality in the sense intended by school board policy No. 4119(5). School boards have broad management powers. RCW 28A-.58. Under RCW 28A.58.100(1) the school board may discharge teachers for "sufficient cause." Policy No. 4119(5) adopted by the school board and in effect during the term of Gaylord's teaching contract with defendant school district permits the Tacoma School Board of Directors to treat "immorality" as sufficient cause for discharge.

"Immorality" as used in policy No. 4119(5) does not stand alone. RCW 28A.67.110 makes it the duty of all teachers to "endeavor to impress on the minds of their pupils the principles of morality, truth, justice, temperance, humanity and patriotism . . ." RCW 28A.70.140 requires an applicant for a teacher's certificate be "a person of good moral character." RCW 28A.70.160 makes "immorality" a ground for revoking a teacher's certificate. Other grounds include the commission of "crime against the law of the state." The moral conduct of a teacher is relevant to a consideration of that person's fitness or ability to function adequately as a teacher of the students he is expected to teach—in this case high school students. *See Morrison v. State Bd. of Educ.,* 1 Cal. 3d 214, 225, 461 P.2d 375, 82 Cal. Rptr. 175 (1969).

■ "Immorality" as a ground of teacher discharge would be unconstitutionally vague if not coupled with resulting actual or prospective adverse performance as a teacher. *Denton v. South Kitsap School Dist. 402,* 10 Wn. App. 69, 516 P.2d 1080 (1973); *Morrison v. State Bd. of Educ., supra* at 225 n.15. The basic statute permitting discharge for "sufficient cause" (RCW 28A.58.100(1)) has been construed to require the cause must adversely affect the teacher's performance before it can be invoked as a ground for discharge. *Gaylord v. Tacoma School Dist. 10, supra.*

It follows the term "immorality" is not to be construed in its abstract sense apart from its effect upon teaching efficiency or fitness to teach. In its abstract sense the term is not and perhaps cannot be comprehensively defined although it can be illustrated.

■ When, as in the case here, the term "immorality" has not been defined in policy No. 4119(5), it would seem reasonable to give the term its ordinary, common, everyday meaning as we would when construing an undefined term in a statute. *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 47, 541 P.2d 989 (1975); *State v. Jones,* 84 Wn.2d 823, 830, 529 P.2d 1040 (1974); *Glaspey & Sons, Inc. v. Conrad,* 83 Wn.2d 707, 711, 521 P.2d 1173 (1974).

Was homosexuality immoral within the meaning of policy No. 4119(5)? We must first examine what the much dicussed term "homosexuality" means. In J. Walinder, *Transsexualism* 3 (1967), the author approves the following statement:

> The crucial characteristic of the homosexual is the desire for a physical sex relation with a person of his own sex. The eonist is repelled by the physical aspect of a homosexual relationship. (2) Homosexuals do not want to change their sex and identity. This is the fundamental anomoly [sic] in eonism.

D. West, in *Homosexuality* 10–11 (1967), the author explains:

> Homosexuality simply means the experience of being erotically attracted to a member of the same sex, and men or women who habitually experience strong feelings of this kind are called homosexuals. Those who act upon such feelings by participating in mutual sexual fondling or other forms of sexual stimulation with a partner of the same sex are known as 'overt' or practicing homosexuals. Those whose erotic feelings for the opposite sex are absent altogether, or slight in comparison to their homosexual feelings, are called exclusive or obligatory homosexuals. This is the type doctors usually have in mind when they refer without further qualification to 'homosexuals', or when they speak of 'true' homosexuals or "inverts", or when they consider the condition more or

less permanent and unchangeable. Indeed, it is this exclusive, obligatory type of homosexual who presents the chief problem for contemporary society, and who is the main concern of this book. The thought of intimate contacts with their own sex disgusts many normal persons, but many of these exclusive homosexuals, especially male homosexuals, are even more appalled by the prospect of relations with the opposite sex.

(Footnote omitted.)

In characterizing homosexuality as immoral, the *New Catholic Encyclopedia,* for example, defines the term homosexual as:

[A]nyone who is erotically attracted to a notable degree toward persons of his or her own sex and who engages, or is psychologically disposed to engage, in sexual activity prompted by this attraction.

. . .

. . . Once friendship between persons of the same sex leads. to physical expression, a homosexual act has occurred . . . The danger remains that the individual will yield to desire for the overt act.

7 *New Catholic Encyclopedia* 116 (1967).

Other observations and definitions of homosexuality are in substance similar to those above quoted. *See* H. English & A. English, *A Comprehensive Dictionary of Psychological and Psychoanalytical Terms* (1958); H. Eysenk & W. Wurzburg, *Encyclopedia of Psychology* 66–67 (1958); 1 R. Goldenson, *The Encyclopedia of Human Behavior* 553–59 (1970); *Blackison's New Gould Medical Dictionary* 471 (1st ed. 1949); *Dorland's Illustrated Medical Dictionary* 686 (24th ed. 1965); *Psychiatric Dictionary* 348–51 (4th ed. 1970); *Steadman's Medical Dictionary* 584 (22d ed. 1972). *See generally The Encyclopedia Americana* 629 (1963); 16 *Encyclopedia Britannica* 603 (1974); 14 *International Encyclopedia of the Social Sciences* 222 (1968).

■■ There appears to be general agreement, so far as it goes, with Webster's definition of homosexual: "'one whose sexual inclination is toward those of the individual's own sex rather than the opposite sex.'" *State v. Rose,* 62

Wn.2d 309, 313, 382 P.2d 513 (1963). In *State v. Rose, supra* at 313, the court approved this definition, continuing

As thus defined, its application in describing appellant might be a permissible deduction from the evidence when arguing to the jury.

The medical and psychological and psychiatric literature on the subject of homosexuality distinguishes between the overt homosexual and the passive or latent homosexual. An overt homosexual has homosexual inclinations consciously experienced and expressed in actual homosexual behavior as opposed to latent. A latent homosexual is one who has "an erotic inclination toward members of the same sex, not consciously experienced or expressed in overt action; opposite of overt." *Steadman's Medical Dictionary, supra* at 584. However, it has been pointed out that "[a]ctually, individual homosexuals do not necessarily maintain an active or passive attitude exclusively in a given relationship, inasmuch as they alternate in the male and female roles." 3 A. Deutsch & H. Fishman, *The Encyclopedia of Mental Health* 747 (1963).

Moreover, homosexual experience of an overt nature varies among homosexuals, from males who are more or less exclusively homosexual to males that are only occasionally so. *See* A. Kinsey, W. Pomeroy & C. Martin, *Sexual Behavior in the Human Male* 650–51 (1948). *See generally* C. Socarides, *The Overt Homosexual* (1968); 3 *American Handbook of Psychiatry* (2d ed. 1974).

In the instant case Gaylord "admitted his status as a homosexual" (finding of fact No. 5) and "from appellant's own testimony it is unquestioned that homosexual acts were participated in by him, although there was no evidence of any overt act having been committed." (Finding of fact No. 3.)

These findings concerning Gaylord's homosexuality are based both on his admission and on other evidence. In determining the significance of the admission we first note the related rule stated in 2 C. Moore, *A Treatise on Facts or the Weight and Value of Evidence* § 1178, at 1322

(1908): "If the meaning of a party's written statement is in doubt, that construction must be adopted which is least favorable to him; 'he selected its language.'" (Citing *Wood v. Chetwood,* 44 N.J. Eq. 64, 14 A. 21, 24 (1888).) This court has also adopted the rule that ambiguous language in written instruments "should be construed against the party using the language." *Jacoby v. Grays Harbor Chair & Mfg. Co.,* 77 Wn.2d 911, 918, 468 P.2d 666 (1970); *Wilkins v. Grays Harbor Community Hosp.,* 71 Wn.2d 178, 427 P.2d 716 (1967).

This rule of construction concerning his admission of homosexuality is supported by evidence that Gaylord was and had been a homosexual for 20 years. He also testified that in the 2–year period before his discharge, he actively sought out the company of other male homosexuals and participated actively as a member of the Dorian Society (a society of homosexuals). He responded to a blind advertisement in the society's paper for homosexual company. He concealed his homosexuality from his parents until compelled to reveal it by the present dispute.

If Gaylord meant something other than homosexual in the usual sense, he failed to explain what he meant by his admission of homosexuality or being a homosexual so as to avoid any adverse inference, although he had adequate opportunity at trial to do so. He clearly had a right to explain that he was not an overt homosexual and did not engage in the conduct the court ascribed to him which the court found immoral and illegal. Evidence that explains the admission or qualifies it is clearly admissible. 1 Conrad, *Modern Trial Evidence* 377 (1966). *See National Ass'n of Creditors v. Grassley,* 159 Wash. 185, 292 P. 416 (1930); *Ryan v. Westgard,* 12 Wn. App. 500, 530 P.2d 687 (1975); *Berkovitch v. Luketa,* 49 Wn.2d 433, 302 P.2d 211 (1963). There was uncontroverted evidence plaintiff was a competent and intelligent teacher so the court could reasonably assume Gaylord knew what homosexuality could mean. It was not a word to be thoughtlessly or lightly used. Gaylord's precaution for 20 years to keep his status of being

a homosexual secret from his parents is eloquent evidence of his knowledge of the serious consequences attendant upon an undefined admission of homosexuality.

He testified that in June 1970 he realized that if he was "ever going to have [homosexual] friends . . . that I needed, that I was going to have to make more efforts of my own to find these people because I wasn't going to stumble across them by accident as I expected." It was about that time he joined the Dorian Society. He testified he "felt very comfortable with the people there." Eventually he began to attend a good many of their functions. On one occasion a high school boy conferred with the plaintiff about homosexuality and learned that plaintiff was "heavily involved" for a period of a month with a person whose advertisement he had answered. It would have been a simple matter for Gaylord to have explained the physical side, if any, of his relationship but he did not do so.

Our next inquiry is whether homosexuality as commonly understood is considered immoral. Homosexuality is widely condemned as immoral and was so condemned as immoral during biblical times. A. Kinsey, W. Pomeroy & C. Martin, *Sexual Behavior in the Human Male* 483 (1948); S. Weinberg & C. Williams, *Male Homosexuals* 17–18, 252, 256 (1974); D. West, *supra* at 96–101; 8 *Encyclopedia Judaica* (1971) col. 961; 7 *New Catholic Encyclopedia* 116–19 (1967); 3 A. Deutsch & H. Fishman, *The Encyclopedia of Mental Health* 763 (1963).

A sociologist testified in the instant case: "A majority of people and adults in this country react negatively to homosexuality." A psychiatrist testified "I would say in our present culture and certainly, in the last few hundred years in Western Europe and in America this [homosexuality] has been a frightening idea . . ."

The court found "sexual gratification with a member of one's own sex is implicit in the term 'homosexual.'" (Finding of fact No. 8.) This finding would not necessarily apply to latent homosexuals, however, the court in effect found from the evidence and reasonable inferences therefrom, it

applied to Gaylord. These acts—sodomy and lewdness—were crimes during the period of Gaylord's employment and at the time of his discharge. RCW 9.79.100 and RCW 9.79.120.

Volitional choice is an essential element of morality. One who has a disease, for example, cannot be held morally responsible for his condition. Homosexuality is not a disease, however. Gaylord's witness, a psychiatrist, testified on cross–examination that homosexuality except in a case of hormonal or congenital defect (not shown to be present here) is not inborn. Most homosexuals have a "psychological or acquired orientation." Only recently the Board of the American Psychiatric Association has stated: "homosexuality . . . by itself does not necessarily constitute a psychiatric disorder." The board explained that the new diagnostic category of sexual orientation disturbance applies to:

> "individuals whose sexual interests are directed primarily towards people of the same sex and who are either disturbed by, in conflict with, or wish to change their sexual orientation." . . . [this is] "distinguished from homosexuality, which by itself does not necessarily constitute a psychiatric disorder."

*A.P.A. Rules Homosexuality Not Necessarily a Disorder,* 9 *Psychiatric News* (Jan. 1974), at 1.

Nevertheless it is a disorder for those who wish to change their homosexuality which is acquired after birth. In the instant case plaintiff desired no change and has sought no psychiatric help because he feels comfortable with his homosexuality. He has made a voluntary choice for which he must be held morally responsible. L. Hatterer, *Changing Homosexuality in the Male, Treatment for Men Troubled by Homosexuality* 58, 445 app. 1 (1970).

The remaining question on this point is whether the repeal of the sodomy statute (RCW 9.79.100), while this case was pending, deprives sodomy of its immoral character. In the first place the repeal did not go into effect until July 1, 1976, sometime after Gaylord's discharge. Sodomy between consenting adults is no longer a crime. RCW

9A.88; RCW 9A.98.010; RCW 9A.88.100. *See also* RCW 9A.88.010 and .020. Generally the fact that sodomy is not a crime no more relieves the conduct of its immoral status than would consent to the crime of incest.

The next question is whether the plaintiff's performance as a teacher was sufficiently impaired by his known homosexuality to be the basis for discharge. The court found that Gaylord, prior to his discharge on December 21, 1972, had been a teacher at the Wilson High School in the Tacoma School District No. 10 for over 12 years, and had received favorable evaluations of his teaching throughout this time. (Findings of fact Nos. 1 and 2.) The court further found that "while plaintiff's status as a homosexual [was] unknown to others in the school," his teaching efficiency was not affected nor did his status injure the school. When, however, it became publicly known that Gaylord was a homosexual "the knowledge thereof would and did impair his efficiency as a teacher with resulting injury to the school had he not been discharged." (Finding of fact No. 9.)

The court further found:

A teacher's efficiency is determined by his relationship with students, their parents, fellow teachers and school administrators. In all of these areas the continued employment of appellant after he became known as a homosexual would result, had he not been discharged, in confusion, suspicion, fear, expressed parental concern and pressure upon the administration from students, parents and fellow teachers, all of which would impair appellant's efficiency as a teacher and injure the school.

(Finding of fact No. 10.)

Gaylord assigns error to findings of fact numbers 9 and 10, contending there is no substantial evidence to support either. We do not agree.

First, he argues his homosexuality became known at the school only after the school made it known and that he should not be responsible therefor so as to justify his discharge as a homosexual. The difficulty with this argument is twofold. First, by seeking out homosexual company he took the risk his homosexuality would be discovered. It was

he who granted an interview to the boy who talked to him about his homosexual problems. The boy had been referred to Gaylord for that purpose by the homosexual friend to whom Gaylord had responded favorably in answering his advertisement in the paper of the Dorian Society. As a result of that interview the boy came away with the impression plaintiff was a homosexual and later told the assistant high school principal about the matter. The latter in turn conferred with plaintiff for the purpose of verifying the charge that had been made. It was the vice–principal's duty to report the information to his superiors because it involved the performance capabilities of Gaylord. The school cannot be charged with making plaintiff's condition known so as to defeat the school board's duty to protect the school and the students against the impairment of the learning process in all aspects involved.

██ Second, there is evidence that at least one student expressly objected to Gaylord teaching at the high school because of his homosexuality. Three fellow teachers testified against Gaylord remaining on the teaching staff, testifying it was objectionable to them both as teachers and parents. The vice–principal and the principal, as well as the retired superintendent of instruction, testified his presence on the faculty would create problems. There is conflicting evidence on the issue of impairment but the court had the power to accept the testimony it did on which to base complained of findings. *See Jacobs v. Brock,* 73 Wn.2d 234, 437 P.2d 920 (1968); *Kuster v. Gould Nat'l Batteries, Inc.,* 71 Wn.2d 474, 429 P.2d 220 (1967). The testimony of the school teachers and administrative personnel constituted substantial evidence sufficient to support the findings as to the impairment of the teacher's efficiency.

It is important to remember that Gaylord's homosexual conduct must be considered in the context of his position of teaching high school students. Such students could treat the retention of the high school teacher by the school board as indicating adult approval of his homosexuality. It would be unreasonable to assume as a matter of law a teacher's

ability to perform as a teacher required to teach principles of morality (RCW 28A.67.110) is not impaired and creates no danger of encouraging expression of approval and of imitation. Likewise to say that school directors must wait for prior specific overt expression of homosexual conduct before they act to prevent harm from one who chooses to remain "erotically attracted to a notable degree towards persons of his own sex and is psychologically, if not actually disposed to engage in sexual activity prompted by this attraction" is to ask the school directors to take an unacceptable risk in discharging their fiduciary responsibility of managing the affairs of the school district.

We do not deal here with homosexuality which does not impair or cannot reasonably be said to impair his ability to perform the duties of an occupation in which the homosexual engages and which does not impair the effectiveness of the institution which employs him. However, even the federal civil service regulations on which Gaylord relies to show a change in attitude towards homosexuals provides:

> [W]hile a person may not be found unsuitable based on unsubstantiated conclusions concerning possible embarrassment to the Federal service, a person may be dismissed or found unsuitable for Federal employment where the evidence establishes that such person's sexual conduct affects job fitness."

2 CCH Employment Practices Guide ¶ 5339 (1975). It must be shown that the conduct of the individual may reasonably be expected to interfere with the ability of the person's fitness in the job or against the ability to discharge its responsibility. 2 CCH Employment Practices Guide, *supra.* These principles are similar to those applicable here. The challenged findings and conclusions are supported by substantial evidence.

Affirmed.

WRIGHT, C.J., HAMILTON, STAFFORD, and BRACHTENBACH, JJ., and KALE, J. Pro Tem., concur.

DOLLIVER, J. (dissenting)—The appellant, Mr. Gaylord, had been a teacher at Wilson High School for over 12 years at the time of his discharge. In college, he had been an outstanding scholar; he graduated Phi Beta Kappa from the University of Washington and was selected "Outstanding Senior" in the political science department. He later received a masters degree in librarianship. As a teacher, the evaluations made of Mr. Gaylord were consistently favorable. The most recent evaluation of this teaching performance stated that "Mr. Gaylord continues his high standards and thorough teaching performance. He is both a teacher and student in his field."

Despite this outstanding record, the trial court found that Mr. Gaylord should be discharged for "immorality." To uphold this dismissal, we must find substantial evidence supporting the finding that Mr. Gaylord was discharged for "sufficient cause," as required by RCW 28A.58.100. "Sufficient cause" has been defined as *"conduct which would affect the teacher's efficiency."* *Gaylord v. Tacoma School Dist. 10,* 85 Wn.2d 348, 349, 535 P.2d 804 (1975). This must be proven by the school district by a preponderance of the evidence. RCW 28A.58.450. For all the scholarly research done by the majority here, the most basic point has been missed; the respondent school board did not meet its burden of proof.

The majority upheld the trial court's finding that an admission of a homosexual status connotes illegal as well as immoral acts which are proscribed by RCW 9.79.100 (sodomy) and RCW 9.79.120 (lewdness). RCW 9.79.100 provides:

Every person who shall carnally know in any manner any animal or bird; or who shall carnally know any male or female person by the anus or with the mouth or tongue; or who shall voluntarily submit to such carnal knowledge; or who shall attempt sexual intercourse with a dead body, shall be guilty of sodomy and shall be punished as follows: . . .

RCW 9.79.120 provides:

Every person who shall lewdly and viciously cohabit with another not the husband or wife of such person, and every person who shall be guilty of open or gross lewdness, or make any open and indecent or obscene exposure of his person, or of the person of another, shall be guilty of a gross misdemeanor.

There is not a shred of evidence in the record that Mr. Gaylord participated in any of the acts stated above. While we have held in the past that "sufficient cause" requires certain *conduct* (*Browne v. Gear,* 21 Wash. 147, 57 P. 359 (1899); *Denton v. South Kitsap School Dist. 402,* 10 Wn. App. 69, 516 P.2d 1080 (1973)), we are presented here with a record showing no illegal or immoral conduct; we have only an admission of a homosexual status and Gaylord's testimony that he sought male companionship. *See McConnell v. Anderson,* 316 F. Supp. 809, 814 (D. Minn. 1970); *compare Moser v. State Bd. of Educ.,* 22 Cal. App. 3d 988, 101 Cal. Rptr. 86 (1972), *with Morrison v. State Bd. of Educ.,* 1 Cal. 3d 214, 461 P.2d 375, 82 Cal. Rptr. 175 (1969).

Undoubtedly there are individuals with a homosexual identity as there are individuals with a heterosexual identity, who are not sexually active. Mr. Gaylord, for all we know, may be one of these individuals. Certainly in this country we should be beyond drawing severe and far-reaching inferences from the admission of a status—a status which may be no more than a state of mind. Furthermore, there are homosexual activities involving a physical relationship which are not prohibited by statute. *See Morrison v. State Bd. of Educ., supra; McConnell v. Anderson, supra.*

The trial court made a most puzzling finding that, "From appellant's own testimony it is unquestioned that homosexual acts were participated in by him, although there was no evidence of any overt acts having been committed." The trial court essentially found that, as an admitted homosexual, unless Mr. Gaylord denied doing a particular immoral

or illegal act, he can be assumed to have done the act. The court has placed upon the appellant the burden to negate what it asserts are the implications that may be drawn from his testimony although he never was accused of participating in acts of sodomy or lewdness.

We must require here, as we have in the past, proof of conduct to justify a dismissal. The only conceivable testimony on conduct was the comment of the student that Gaylord and another male were "deeply involved" for about a month. This hardly qualifies as testimony either as to "immorality," sodomy, or lewdness. Finding no conduct, I am unwilling to take the leap in logic accepted by the majority that admission of a status or identity implies the commission of certain illegal or immoral acts.

In *McConnell v. Anderson, supra* at 814, the court said:

> An homosexual is after all a human being, and a citizen of the United States despite the fact that he finds his sex gratification in what most consider to be an unconventional manner. He is as much entitled to the protection and benefits of the laws and due process fair treatment as are others, at least as to public employment in the absence of proof and not mere surmise that he has committed or will commit criminal acts or that his employment efficiency is impaired by his homosexuality. Further, the decided cases draw a distinction between homosexuality, i.e., sexual propensity for persons of one's own sex and the commission of homosexual criminal acts. Homosexuality is said to be a broad term involving all types of deviant sexual conduct with one of the same sex, but not necessarily criminal acts of sodomy.

Surely the majority has adopted a novel approach. Mr. Gaylord was never at any time accused of performing any "homosexual acts." Yet because of his declared status, he must assume the burden of proving he did not commit certain illegal or immoral acts which have at no time been referred to or mentioned, much less described, by the school board. Presumably under this reasoning, an unmarried male who declares himself to be heterosexual will be held to have engaged in "illegal or immoral acts." The

opportunities for industrious school districts seem unlimited.

The majority goes to great lengths to differentiate between an overt and a latent homosexual. Authority is cited that overt homosexuality is "consciously experienced and expressed in actual homosexual behavior." Yet there is no evidence in the record of any actual behavior or acts, and the findings of the trial court specifically state "there was no evidence of any overt acts having been committed." The real problem faced by the majority is that the term "homosexual" is not mentioned once in the Revised Code of Washington. There is no law in this state against being a homosexual. All that is banned (prior to July 1, 1976) are certain acts, none of which Mr. Gaylord was alleged to have committed and none of which can it be either assumed or inferred he committed simply because of his status as a homosexual.

The second glaring error in this proceeding is the respondent's failure to establish that Mr. Gaylord's performance as a teacher was impaired by his homosexuality. As pointed out by the trial court in its findings, the evidence is quite clear that, having been a homosexual for the entire time he taught at Wilson High School, the fact of Mr. Gaylord's homosexuality did not impair his performance as a teacher. In other words, homosexuality per se does not preclude competence. *Acanfora v. Board of Educ.*, 359 F. Supp. 843 (D. Md. 1973).

The evidence before the court is uncontroverted—Mr. Gaylord carefully kept his private life quite separate from the school. *Compare Acanfora v. Board of Educ., supra.* He made no sexual advances toward his professional contemporaries or his students. There is absolutely no evidence that Mr. Gaylord failed in any way to perform the duties listed in RCW 28A.67.110. In over 12 years of teaching at the same school, his best friends on the teaching staff were unaware of his homosexuality until the time of his discharge. Gaylord did not use his classroom as a forum for discussing homosexuality. Given the discretion with which

Gaylord conducted his private life, it appears that public knowledge of Gaylord's homosexuality occurred, as the trial court found, at the time of his dismissal. *Compare Pettit v. State Bd. of Educ.,* 10 Cal. 3d 29, 35, 513 P.2d 889, 109 Cal. Rptr. 665 (1973). *Cf. McConnell v. Anderson, supra.*

At the trial, a variety of witnesses speculated on the effect that Gaylord's homosexuality might have on his effectiveness in the classroom. The speculation varied considerably. Certainly there were witnesses who testified that Gaylord's effectiveness would be damaged. There were also those who testified to the contrary. As a result, the trial court found that "the continued employment of appellant after he became known as a homosexual would result, had he not been discharged, in confusion, suspicion, fear, expressed parental concern and pressure upon the administration." The question this court must ask is whether a finding of detrimental effect can be made on the basis of conjecture alone.

The language of the court in *Fisher v. Snyder,* 346 F. Supp. 396, 401 (D. Neb. 1972), is helpful on this point. In that case, the teacher, Fisher, a single woman, had men "'not related'" stay in her apartment "'on several occasions ranging from one night to a period of at least one week.'" In holding that Mrs. Fisher's contract could not be terminated, the court said:

> Similarly, to justify a dampening of the rights of assembly or association and privacy the state in the present case must show that the termination of the teacher's contract was caused by conduct which "materially and substantially" interfered with the school's work or rights of students, and "undifferentiated fear or apprehension" of such interference is not enough. In the present case the state has failed to show any actual interference by Mrs. Fisher's conduct with any interest of the state in its educational endeavors. Not as much as a single student or teacher or administrator—or even townsperson—came forward with evidence that Mrs. Fisher's associations had affected any relationship she had with any student, any teacher, or any administrator.

Her effectiveness as a teacher, disciplinarian, or counsellor stands without factual challenge. It is the lack of any factual, as contrasted with imagined or theoretical, connection between Mrs. Fisher's association and a substantial weakening of the educational enterprise conducted by the board of education that must result in a finding that the termination of the contract was not constitutionally justified.

*See also Acanfora v. Board of Educ., supra.*

Historically, the private lives of teachers have been controlled by the school districts in many ways. There was a time when a teacher could be fired for a marriage, a divorce, or for the use of liquor or tobacco. *See* H. Beale, *A History of Freedom of Teaching in American Schools* (1966 ed.); F. Delon, *Substantive Legal Aspects of Teacher Discipline* (1972). Although the practice of firing teachers for these reasons has ceased, there are undoubtedly those who could speculate that any of these practices would have a detrimental effect on a teacher's classroom efficiency as well as cause adverse community reaction. I find such speculation to be an unacceptable method for justifying the dismissal of a teacher who has a flawless record of excellence in his classroom performance. *See generally* 82 Harv. L. Rev. 1738, 1742 (1969).

What if Mr. Gaylord's status was as a black, a Roman Catholic, or a young heterosexual single person, instead of a male homosexual? Would his dismissal be handled in such manner? Mere speculation coupled with status alone is not enough. Finding No. 10 of the trial court reads as follows:

A teacher's efficiency is determined by his relationship with students, their parents, fellow teachers and school administrators. In all of these areas the continued employment of appellant after he became known as a homosexual would result, had he not been discharged, in confusion, suspicion, fear, expressed parental concern and pressure upon the administration from students, parents and fellow teachers, all of which would impair appellant's efficiency as a teacher and injure the school.

In this finding, substitute the words "black" or "female" for "homosexual" and the defect of the majority approach is brought into sharp focus.

The basic unfairness of this situation was well expressed by Mr. Gaylord when he testified:

> I quite frankly find it rather galling to have sat through the school board hearing and once again through this trial and hear administrators say that I'm a good teacher, I've been a very good teacher, and yet to be without a job, particularly when I see other people who still hold their jobs who haven't read a book or turned out a new lesson plan or come up with anything creative in years.

"'The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection.'" *Morrison v. State Bd. of Educ.*, 1 Cal. 3d 214, 239, 461 P.2d 375, 82 Cal. Rptr. 175 (1969), quoting *Yakov v. Board of Medical Examiners*, 68 Cal. 2d 67, 75, 435 P.2d 553, 64 Cal. Rptr. 785 (1968). To base a dismissal on the proof of a status with no showing of conduct and no showing of an actual detrimental effect on teaching efficiency violates the constitutional due process rights to which Mr. Gaylord is entitled. *See Mindel v. United States Civil Serv. Comm'n*, 312 F. Supp. 485 (N.D. Cal. 1970).

I dissent.

UTTER, J. (concurring in the dissent)—I concur in the result reached by the dissent. At the conclusion of the only trial where testimony was taken, the court found, "'There is no allegation or evidence that James Gaylord has ever committed any overt acts of homosexuality.'" *Gaylord v. Tacoma School Dist. 10*, 85 Wn.2d 348, 349, 535 P.2d 804 (1975). After remand, with no additional testimony having been taken, the trial court entered a second finding on the same issue, stating, "it is unquestioned that homosexual acts were participated in by him, although there was no evidence of any overt acts having been committed." This finding is not supported by substantial evidence in the record.

No one asked Gaylord whether he was involved in any overt act or acts. As the dissent points out, mere proof of the "status" of homosexuality is an insufficient basis for discharge of a teacher on the grounds of immorality. The burden of proof to establish something more was on the district, not Gaylord. The majority has concluded that Gaylord's admission of deep involvement with another male is sufficient to raise an inference of participation of immoral activity. His discharge should not be based upon this slimmest of inferences.

DOLLIVER, J., concurs with UTTER, J.

Petition for rehearing denied April 15, 1977.