[No. 30000.  *En Banc.*  January 9, 1947.]

GUY NORMAN, *Appellant,* v. BEULAH M. NORMAN, *Respondent.*[1]

*McMullen & Snider,* for appellant.

*Schaefer & Hall,* for respondent.

MALLERY, J.—The plaintiff husband and defendant wife were married in Kansas on February 22, 1937.  He was thirty-four years of age, and she was nineteen.  He was and is a mechanic employed by construction companies, which resulted in their living in twenty-six different places since their marriage.  They came to Vancouver, Washington, in the early part of 1942, where they both worked in the shipyard.  At the time of the trial, she was employed as a post-office clerk in charge of substation No. 3 in Vancouver, being an employee of the drug company in which the substation was located.  She also boarded two of his brothers, one for about a year and one for about two years.  She did their washing, ironing, and clothes mending.  The money thus derived and her wages went into the common savings.

Concerning the boarding experience, she testified as follows:

[1]Reported in 176 P. (2d) 349.

"MR. SCHAEFER: Q. Did you kick about every member of his family that lived with you? A. Yes, I did kick. Q. About both of them? A. No, his two brothers that lived with us were twins and they were as opposite as day and night, and the one that is in the Navy in my opinion is a perfect gentleman, because when he was in the home, I never washed a dish that he wasn't right there to dry. He would wash. He would hang clothes on the line. He would make the beds—whatever he could do—but the other one was just opposite. Q. What did he do to annoy you? A. He used to chew tobacco and open the front door and spit. He would spit all over the place, back porch and steps. I had a flower bed—and I told his brother that next time he spit on the porch he was cleaning it up. He would take a bath once in three weeks. When he would get there—like a big fat hog—he would take off his trousers when he went to bed at night. I was actually ashamed to hang the sheets on the clothes line. He was the most finicky in his eating that I have ever known. Every morning he wanted saddle blankets. The other meals he would want meat, potatoes, gravy and beans boiled, navy beans. One of my most embarrassing moments, I had guests for Christmas dinner and I had my new Haviland China and I had Mrs. Benson, here in the court room, as one of the guests. He sat down and said, 'You are not going to feed me these God damned worms.' So he said, 'I want something to eat,' and he said, 'Maw, you haven't got the bread on the table.' And I said, 'I haven't got the bread on the table because we are having hot rolls.' In passing him anything he would put out his hand and shove it away, never passed a plate of food on to anyone else. Thanksgiving after baby was born I had turkey, dressing, cranberry sauce. I didn't have mashed potatoes and gravy but had sweet potatoes. He asked where they were. I said I didn't have them. He gets up and gets a glass of water and opens up some pork and beans. He ate the white meat of the turkey. If we had muffins he wouldn't eat them. If the eggs weren't cooked right he would push them away. I never liked it, but Mr. Norman said it was his home and he was going to have who he pleased there. Q. How long did that brother stay? A. Altogether about two years. That was the one that he told me he thought more of him."

The total amount of social life or recreation he provided for her in Vancouver was one dance, five shows, three ice hockey games, and one ice show. The question of recrea-

tion was the source of many arguments between them. He enjoyed fishing and engaged in it when opportunity afforded. He testified that in a year and a half they had five acts of sexual intercourse.

About two and a half years before the trial, she met a man by the name of Gott, who was on good terms with her husband. Gott had accompanied them to three of the shows they had attended, was a frequent visitor at their house for dinner with the husband's consent, and was known by him to be with her on many of the occasions when the husband went fishing. She fell in love with Gott and committed adultery with him over a protracted period. She testified Gott was the father of the child here involved and that she hoped to marry him in the future.

The court found, and it is amply supported by the record, that she is a good cook and housekeeper, has a deep affection for the child, and takes good care of it. The court awarded him a decree of divorce and granted her the custody of the child.

He appeals and assigns as error the court's finding that she is a proper person to be given custody of the child and in not giving the custody to him. His contention can be stated by quoting from his brief:

"In this case the trial court apparently *placed a judicial stamp of approval on such conduct.*

"It is our feeling that to permit this decision to stand as the law of this state *would judicially lower the moral standards* that have heretofore prevailed and announce to the world that henceforth the standards of morality can be entirely abandoned and that a mother guilty of such misconduct may still be awarded custody of a child in spite of the fact that the father is a fit and proper person with all necessary facilities and surroundings for raising the child."

This contention is a *non sequitur.* We are not here concerned with the question of either punishment or approval of the conduct of a party to this action. As the court so aptly stated in its memorandum opinion:

"This question of disposition of custody of the child is not to be approved from the point of view of the supposed rights of the father and mother or with any ideas of pun-

ishing or rewarding one or the other on account of conduct, but rather from the point of view of the welfare of the child. This child is still very young, scarcely more than a baby, and under well-recognized principles its custody should go to its mother unless the court is able to find that that would not be consistent with its welfare."

This is a correct statement of the approach the court should make in performing its duty.

The issue here is well stated in the court's memorandum opinion:

"The position of the plaintiff is that the defendant is an unfit person to be given the child's custody but this charge is based almost altogether upon her unfaithfulness to her husband."

The memorandum opinion continues:

"The evidence does not disclose that she was lacking in any way in the care of the child or affection for it. In fact, she seemed to be an exceptionally good mother. She is a good housekeeper and cook and always cared for the child unusually well. Also, the evidence seems to indicate that she has a deep affection for the child. . . . In reaching this conclusion I give no weight whatever to the claim of the defendant that this child is not the child of the plaintiff."

The instant case is not similar to the case of *Bornstine v. Bornstine*, 21 Wn. (2d) 104, 150 P. (2d) 60, where the minor children were awarded to the father, for in that case the mother, in order to consummate a marriage with another, abandoned her children to the father, whom she deserted. In the instant case, the respondent sought a reconciliation with her husband upon any terms in order to be with the baby. He prescribed as conditions to a reconciliation that she have a baby by him within one year, that she couldn't drive the car, that she couldn't have more than five dollars, and that someone had to live with them in their home for one year. She accepted these terms and brought her clothes back to the house the next day, which was Saturday. He had told her he would take her to the beach the next day. Sunday she prepared a picnic dinner, took care of the baby, and was waiting for his brother and

his brother's wife to get up when he told her to pack her suitcase and get out, as his brother wouldn't let his wife live in the same house with her and that he "thought a hell of a lot more of him than I do of you." After crying for an hour, she packed her suitcase and left.

The issue in this case is this: Is the respondent, who, although not promiscuous, admits she is an adulteress, necessarily, by reason of that fact alone, conclusively shown to be an unfit person to have custody of her child? The trial court, in awarding custody of children in divorce actions, must consider many imponderable factors bearing upon the future welfare of the children. The adultery of a mother is, of course, a very weighty factor, but we are not prepared to say that it excludes the consideration of all other factors and is alone completely determinative of the issue. We are not prepared to say that the trial court has abused its discretion in the instant case.

The judgment is affirmed.

MILLARD, C. J., STEINERT, ROBINSON, JEFFERS, CONNELLY, and ABEL, JJ., concur.

SIMPSON, J. (dissenting)—In order to be definite, I quote from Mrs. Norman's testimony as follows:

"Q. Now, in your answer you set up that he started coming clandestinely to the home of the parties. When was that, please? A. The first time he was there he came with Mr. Bob Reckert. He is a friend of Mr. Norman's and myself. And Mr. Gott was going to California and he was going to have breakfast at his home and he stopped by to pick up Mr. Norman and myself and they had a drink. Q. When was that? A. Let's see. Must have been in August. Q. August, 1943? A. The year I met him, yes, because he was leaving for California. Q. *Now, when was it that you and Mr. Gott commenced having sexual relations? A. Well, it was in January, in January when he came back. Q. What year? A. Two years ago. Q. 1944? A. Yes. Q. Where did this take place? A. East Vancouver. Out in East Vancouver in Mr. Norman's and my home. Q. Do you remember what time in January that was? A. The first time was January 16. Q. And when was the next occasion? A. Well, it was two or three months*

*later.  Q.  You would say April?  A.  It could be April.
Q.  And where did that take place?  A.  Out at East Van-
couver.  Q.  At the home?  A.  Yes.  Q.  And the next occa-
sion?  A.  Well, I can't recall all of them, but they all took
place right in the house.  Q.  About how many—what num-
ber of times did you have sexual relations?  A.  Oh, about
ten.   .   .   .*

"Q.  In July '45 you went to Spokane?  A.  That's right.
Q.  Did you go any place else?  A.  I went to Coeur d'Alene,
Idaho.   Q.  Well, the next day— A.  If you have the date,
you know more about it than I do.  Q.  When did you leave
for Spokane?  A.  I left eight or nine o'clock.  Must have
been around nine.  Q.  What time did you leave the home?
A.  Around eight.  Q.  And who took you from home?  A.  I
left the house with my baby by myself.  Q.  How did you
get down town?  A.  Taxicab.  Q.  Where did you meet
Gott?  A.  He was in the cab also.   .   .   .

"Q.  Where did you stay that night?  A.  Davenport
Hotel.  Q.  Under what name?  A.  Mr. and Mrs. B. M.
George.  Q.  Yes.  You occupied a room together that
night?  A.  Yes.  Q.  When you testified before you testi-
fied falsely?  A.  I know I did.  Q.  *You perjured yourself
on that occasion?*  A.  Yes.  Q.  How long did you stay at
the Davenport?  A.  One night.  Q.  Where did you go then?
A.  Coeur d'Alene.  Q.  Where did you stay?  A.  Desert
Hotel.  Q.  Also as Mr. and Mrs. B. M. George?  A.  Yes.
Q.  And you testified differently the other time?  A.  Yes, I
know I did.  Q.  Now, when did you pick up your suitcase
in Coeur d'Alene?  A.  I didn't pick it up.  I didn't need it.
It was shipped back to Vancouver.  Q.  Didn't you call for
it?  A.  No, I didn't.  Q.  Did Mr. Gott call for it?  A.  No,
I had sufficient things for the baby and that is all I needed.
Q.  How many days did you stay at Coeur d'Alene—at
the Desert at Coeur d'Alene?  A.  I can't truthfully say.
I don't remember.  Q.  You remember whether it was one
day or three or four nights?  A.  It was three or four nights.
Q.  You occupied the same bed?  A.  We had twin beds.
Q.  You weren't in the same bed together?  A.  No.   .   .   .

"Q.  Where is Gott now?  A.  In Portland.  Q.  Where-
abouts in Portland?  A.  He works at Ritchie's Cigar Store,
Fifth and Stark.  Q.  Where is he living now?  A.  Vanport.
Q.  Whereabouts in Vanport?  A.  Well, I don't know the
number.  Q.  When were you over there last?  A.  I was
there yesterday.  Q.  And before that when were you there
last?  A.  The night before.  Q.  And you stayed there all

night? A. No, I have never stayed there all night. Q. Does he have an apartment alone? A. No, with two other fellows. Q. And how many times have you been there since the first of December? A. Since the first of December—well, maybe 15 times. *Q. When was the last time you had sexual relations with him? A. Oh, a couple of weeks ago. Q. Where? A. At the apartment. Q. Which apartment? A. Where he lives. Q. And prior to that about how long? A. Oh, about a week. Q. You have been having sexual relations with him regularly, is that correct? A. Yes, I have. Q. Over how long a period? A. Well, since last August, September—somewhere in there. Q. You mean a period of once a week or oftener or not so often? A. Oh, about once a week. . . .*

"*Q. Now, he was coming there to the house out at East Vancouver? A. That's right. Q. Practically every night after Mr. Norman went to work, isn't that right? A. No, not every night. Q. I say practically every night. A. What do you mean practically? Q. Well, at least several times a week? A. Yes. Q. And that had continued since when? A. Well, after I quit work at the shipyard. Q. Well, when did you quit work at the shipyard? A. July 15th. Q. 1943? A. Yes. Q. Or was it 1944? A. No, two years ago. This is 1945 so it would be two years ago last July. Q. Or is it a year ago? A. Two years ago. Q. And about how often would he come to your place? A. Well, about—for a while he didn't come regularly because he was holding down two jobs and he worked swing shift and he continued working. Then when he quit working swing shift he began to come over in the evening. Q. When did he quit swing shift, do you know? A. I believe it was in November. Q. In '43? A. Yes, the following November.*

"The Court: This January date, was it 1944 or 1943? Mr. Snider: As I understand it, two years this coming January. The Witness: Yes.

"By Mr. Snider: Q. And at least when he wasn't working swing shift—let's see, Mr. Norman worked swing shift. Gott would wait until Norman had gone to work on swing shift then he would move in. When he quit work on swing shift and went to Vanport, when he got off work he would come over in the evening. Mr. Norman would come in at 12:30 or 1:00 o'clock and Mr. Gott was gone when he came home. Well, then Mr. Norman, for a while, worked the graveyard shift? A. Yes, he did. *Q. What time did Gott get there during that time? A. Oh, he came around 8:30*

*or 9:00 when he was working. Q. When he was working graveyard, I say. A. Yes. Q. Where was Mr. Norman? A. Oh, he was working graveyard. Q. No, when he was working graveyard? A. Mr. Norman used to leave the house around 11:30 and he would come after he went to work. Q. About how long afterwards? A. Oh, sometimes a few minutes, sometimes thirty minutes, maybe an hour. Q. Then he left in the morning before Mr. Norman got back? A. He would leave around five or six o'clock. Q. And that was several times each week? A. Yes, sir."* (Italics mine.)

Appellant does not drink or gamble, nor does the record indicate that he has any other bad habits. He was an assistant superintendent in the mechanical department of the Kaiser Shipyards in Vancouver, Washington. He was a hard-working man and had almost paid for his home in Vancouver. His household furniture and automobile were paid for, and he had a savings account of twenty-one hundred dollars in the bank. Aside from that, he had purchased sixty-one fifty-dollar war bonds.

Appellant had no knowledge of his wife's misdeeds until July, 1945, when she journeyed to Spokane with Gott.

Appellant's sister, who has brought up two boys of her own, had taken care of the baby for some time before the trial, and testified that she was willing to assist her brother in taking care of his child.

The majority opinion sets out certain evidence given by respondent. I cannot determine the reason for so doing. Respondent admitted that she was a perjurer. She was not believed by the trial court. The reason for granting a decree of divorce to appellant is contained in the following excerpt of the trial judge's memorandum opinion:

"The right of the plaintiff to a divorce is almost undisputed. The defendant's cross-complaint is based on technical cruel treatment consisting largely of neglect. While there may have been some neglect of the wife on the part of the husband, I can not find that it was of a sufficiently serious nature under all the circumstances of the case to warrant granting a divorce to the defendant. The neglect charged was mainly subsequent to the misconduct of the defendant and therefore, of course, constituted no excuse

for her conduct. On the whole state of the record, the divorce is granted to the husband as plaintiff."

There is presented in this case a most alarming theory. Counsel for respondent in his brief stated:

"No lesser authority than the Archbishop of York commented recently upon the matter of adultery, the same appearing in the Oregon Journal (Portland) in a news item under the London date line of May 22, 1946, in which he is quoted as follows:

" 'The Archbishop of York, condemning "easy toleration" of divorce, said today that adultery should not be considered an unforgivable wrong. "We must teach the duty of forgiveness," he said in a presidential address to the Convocation of York. "It never must be taken for granted that an act of adultery has inflicted a wrong which can never be forgiven or remedied. Genuine forgiveness can heal deep wounds.["]'

"We can reasonably assume from this that this high ranking church authority does not consider adultery under all circumstances as amounting to gross immorality."

I must differ with counsel in his interpretation of the statement made by the English clergyman. I must also differ with the conclusion of the trial court and my fellow judges relative to the disposition of the child of appellant and respondent. The question for consideration in this case is not that of forgiveness, but rather the welfare of the child.

Adultery is condemned in no uncertain words in the Holy Bible. (See Ex. 20:14; Deut. 5:18; Heb. 13:4; Mat. 5:27; Rom. 13:9; and Gal. 5:19.)

The penalty:

"And the man that committeth adultery with *another* man's wife, *even he* that committeth adultery with his neighbour's wife, the adulterer and the adulteress shall surely be put to death." Lev. 20:10.

"Know ye not that the unrighteous shall not inherit the kingdom of God? Be not deceived: neither fornicators, nor idolaters, nor adulterers, nor effeminate, nor abusers of themselves with mankind, . . . shall inherit the kingdom of God." I. Cor. 6:9, 10.

The legislature of the state of Washington has condemned adultery:

"Whenever any married person shall have sexual intercourse with any person other than his or her lawful spouse, both such persons shall be guilty of adultery and upon conviction thereof shall be punished by imprisonment in the state penitentiary for not more than two years or by a fine of not more than one thousand dollars: . . ." Rem. Rev. Stat., § 2457 [P.P.C. § 113-71].

Our law also condemns perjury:

"Every person who, in any action, proceeding, hearing, inquiry or investigation, in which an oath may lawfully be administered, shall swear that he will testify, declare, depose or certify truly, or that any testimony, declaration, deposition, certificate, affidavit or other writing by him subscribed is true, and who, in such action, proceeding, hearing, inquiry or investigation shall state or subscribe as true any material matter which he knows to be false, shall be guilty of perjury in the first degree and shall be punished by imprisonment in the state penitentiary for not more than fifteen years." Rem. Rev. Stat., § 2351 [P.P.C. § 118-1].

Respondent says that she loves her child. The record shows, by the continuance of her relations with Gott to within a short time before the trial, that she was more concerned with her relations with Gott. She continued in these relations even when she knew that she was in danger of losing the custody of her child.

But respondent says she will marry her paramour, Gott. I maintain that a home so constituted is not a fit and proper place to rear a young American, because the moral atmosphere could not be worse.

On the one hand we have an honest, sober, industrious man, doing his best by hard work to build a home for his wife and child—on the other, a woman and a man insensible to the laws of God and man.

The majority opinion places a premium upon lawbreakers —condemns the honest—and sentences a child to an immoral atmosphere which cannot make of him a good citizen.

The judgment should be reversed, and the custody of the child given to appellant.

Schwellenbach, J., concurs with Simpson, J.