[No. 44433. En Banc. October 5, 1978.]

JAMES EARL SCHUSTER, *Appellant,* v. SANDRA LEE SCHUSTER, *Respondent.*

JERRY FLOYD ISAACSON, *Appellant,* v. MADELEINE CECIL ISAACSON, *Respondent.*

*Clay Nixon* and *Theodore H. Gathe,* for appellants.

*Rosselle Pekelis Higgins, Marjorie Singer, Julie Herak,* and *Arnold Pedowitz,* for respondents.

*Carol Schapira* on behalf of National Organization for Women and *Catherine Hillenbrand, Phyllis Selinker, Josephine B. Vestal,* and *Anne L. Ellington* on behalf of Lesbian Mothers' National Defense Fund, amici curiae.

BRACHTENBACH, J.—These consolidated cases involve factually related divorces. The respondent women separated from their husbands and lived together in a lesbian relationship with their children of their marriages. The appellant fathers filed for divorces from their respective spouses. Each mother was given custody of her children. However, the mothers were ordered to live separate and apart and were prohibited from removing the children from the state. *Those decrees were not appealed.*

Later, each of the fathers filed modification petitions seeking custody of their children. Subsequently, motions for contempt were filed charging violations of the original decrees. The alleged violations by the mothers were: (1) renting separate apartments in the same building but in fact living together along with all the children; and (2) taking the children out of state. The mothers filed counter petitions seeking modification of the original decrees by deleting the prohibition against their living together.

The two modification proceedings were joined for hearing. An attorney was appointed to represent the children's interests. The findings and conclusions resulted in the custody of the children remaining with the mothers and the deletion of the prohibition against the mothers living together in an open and publicized lesbian relationship. We affirm in part and reverse in part.

At the outset we emphasize that these cases do not involve the question of whether it was proper to award custody of the children to lesbian mothers. That question was litigated in the original divorce actions. No appeal was taken by any party. There being no appeal, the original award of custody with all limitations contained therein is binding on all parties and upon this court. The issue is simply not before us.

 The only question presented by this appeal is whether any modification of the original decrees was proper. When is a modification of the custody provisions of an original divorce decree justified? We have long held that a modification will not be granted unless there has been a subsequent substantial change in circumstances which requires a modification of custody in the best interests of the children. *Peugh v. Peugh*, 67 Wn.2d 469, 408 P.2d 10 (1965).

The policy is obvious. Children and their parents should not be subjected to repeated relitigation of the custody issues determined in the original action. Stability of the child's environment is of utmost concern. If an error was allegedly made in the original custody award, the remedy is by appeal. We repeat that the fathers did not appeal from the award of custody to the mothers; the mothers did not appeal from the prohibition against their living together.

This philosophy of stability in custody matters has been adopted by the legislature. In the marriage dissolution act of 1973, it prohibited a modification of a prior custody decree unless the court finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has

occurred in the circumstances of the child or his custodian and that a modification is necessary to serve the best interests of the child. RCW 26.09.260(1).

Under these guidelines, the fathers must lose their modification petitions. Their circumstances have changed; each has remarried. They were found by the trial court to be good and capable fathers, vitally interested in their children. But the statute requires a change in the circumstances of either the child or the custodian, the mothers in this case.

Has there been any change in the circumstances of the mothers to warrant a modification of the custody decree to allow them to live together?

In their modification petitions, the respondent mothers did not allege any change of circumstances and the findings and conclusions evidence absolutely none. At best the respondents established that it was preferable for their own personal circumstances, both financially and in pursuit of their relationship, to live together. That issue had been tried, they lost and did not appeal. They did not meet the judicial or statutory standards to change it. Therefore it was error to modify that aspect of the decrees.

Respondents make a belated effort to raise constitutional questions of freedom of association, equal protection and due process from the requirement that they live separate and apart. First, there is more involved than the rights of these two women. The lives of six children are at stake. Second, neither side has briefed nor argued the constitutional issues as they relate to this requirement. Though the amicus curiae brief did discuss the issue, appellate courts will not pass upon points raised only by amicus. *Long v. Odell*, 60 Wn.2d 151, 372 P.2d 548 (1962).

Finally, we turn to the fathers' argument that the trial court erred in failing to find the mothers in contempt for alleged violations of the original divorce decrees. As we noted in *State v. Caffrey*, 70 Wn.2d 120, 122–23, 422 P.2d 307 (1966):

> Punishment for contempt of court is within the sound discretion of the judge so ruling. Unless there is an abuse of a trial court's exercise of discretion, it will not be disturbed on appeal.

(Citations omitted.)

It appears that the fathers seek to use violation of the decrees as a basis to justify a change of custody. Suffice it to say that even if the trial court had found the mothers in contempt, that alone would not justify a change in custody. Punishment of the parent for contempt may not be visited upon the child in custody cases. The custody of a child is not to be used as a reward or punishment for the conduct of the parents. "The court shall not consider conduct of a proposed guardian that does not affect the welfare of the child." RCW 26.09.190. The best interests of the child are the paramount and controlling considerations. *Thompson v. Thompson,* 56 Wn.2d 244, 352 P.2d 179 (1960).

The trial court is affirmed except for its deletion of the requirement that the respondent mothers live separate and apart. As to that, it is reversed. The matter is remanded for entry of decrees in accordance with this opinion.

Stafford, Horowitz, and Hicks, JJ., concur.

Dolliver, J. (concurring in part, dissenting in part)—I concur with the reasoning of the majority in its affirmance of the award of custody to the defendants. I dissent on the modification of the decree relating to the defendants' living arrangements.

The controlling statute on modification of custody awards states, in relevant part:

> The court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custo-

> dian and that the modification is necessary to serve the best interests of the child.

RCW 26.09.260(1).

In the findings at the time of the dissolutions, the trial court specifically found Sandra Schuster and Madeleine Isaacson were cohabiting and that "such living arrangements are not in the best interest of the children." However, the court in the modification proceedings which are now before us found:

> That since the time of the Divorce Decree the respondents at first lived separate and apart and then moved into adjoining apartments where they in fact lived together as one household and that the living arrangement did not prove to be against the best interests of the children, except it added a financial burden.

Thus, contrary to the assertion of the majority, a change of circumstances is contained in the findings. This change went far beyond the personal convenience of the defendants and was not to be found against the best interests of the children. The crucial question, then, is not whether the trial court made a finding of changed circumstances but whether there is evidence in the record to support the findings.

During the trial, voluminous testimony was taken on the living environment in which the children of the parties were being raised. According to expert testimony, since the divorce decrees the Isaacsons and Schusters had come to regard themselves as a family of eight; the Isaacson and Schuster children would refer to one another as brother or sister. Testimony established that there was a "cross-over of the parent roles" between Ms. Isaacson and Ms. Schuster for the nurturing and assistance of the children. This development of a family unit and the strengthening of the relationships among the eight family members presents a significant change of circumstances which may appropriately be recognized and was recognized by the trial court in its findings.

Furthermore, in its oral opinion, the trial court stated that living apart for the sake of appearances was imposing a financial burden on the parties and their children. This circumstance was also recognized in the findings. Where the funds of the parties are limited, the children would naturally be affected adversely by an unnecessary expenditure of household resources.

The trial court should be given broad discretion in matters dealing with the welfare of the children. A finding was made of changed circumstances. Substantial evidence is in the record to support this finding. The disposition of this case should not be disturbed except for a manifest abuse of discretion. *Lambert v. Lambert,* 66 Wn.2d 503, 403 P.2d 664 (1965); *Selivanoff v. Selivanoff,* 12 Wn. App. 263, 266, 529 P.2d 486 (1974). No abuse has been shown.

The change of circumstances which occurred here may have developed while Ms. Schuster and Ms. Isaacson were in violation of the original decree, an act which this court need not approve. Nevertheless, it occurred. The trial court chose not to punish the parties for contempt and, finding no abuse of discretion, we have agreed. The majority rightly states that "Punishment of the parent for contempt may not be visited upon the child in custody cases. The custody of a child is not to be used as a reward or punishment for the conduct of the parents." This is a salutary rule. Having so held, we should not now punish the parties backhandedly by refusing to recognize an unquestionable change of circumstances found by the trial court and established by ample evidence.

UTTER, J., concurs with DOLLIVER, J.

ROSELLINI, J. (dissenting)—In awarding custody of children, the primary or paramount consideration is the welfare of the children. *Pierce v. Pierce,* 52 Wash. 679, 101 P. 358 (1909); *Thompson v. Thompson,* 56 Wn.2d 244, 352 P.2d 179 (1960).

Granting that a change of circumstances needs to be found to modify a custody decree, such change of circumstances exists. In the finding at the time of the dissolution, the trial court specifically found that Sandra Schuster and Madeleine Isaacson were cohabiting and that such living arrangements were not in the best interest of the children.

This finding was made to insulate the children from the harmful atmosphere of living together in the same household where evidence of cohabitation would be apparent.

Since that time the respondents have in fact lived together in one household and have publicly espoused on radio, television and in lectures the superiority of the homosexual lifestyle. They have involved their children in these activities. This is a change of circumstances that requires the court to reexamine the correctness of its previous custody order.

In *Gaylord v. Tacoma School Dist. 10,* 88 Wn.2d 286, 559 P.2d 1340 (1977), this court held that a teacher was "guilty" of immorality because of his status of being a homosexual. Also, the evidence in the case did not involve any known homosexual acts. Nevertheless, this court assumed that his effectiveness as a teacher would be impaired. Mr. Gaylord was an excellent teacher. His superior's evaluation of his teaching effectiveness stated: "Mr. Gaylord continues his high standards and thorough teaching performance. He is both a teacher and student in his field."

In regard to the effect of Mr. Gaylord's status as a homosexual, the opinion stated at pages 298–99:

> It is important to remember that Gaylord's homosexual conduct must be considered in the context of his position of teaching high school students. Such students could treat the retention of the high school teacher by the school board as indicating adult approval of his homosexuality. It would be unreasonable to assume as a matter of law a teacher's ability to perform as a teacher required to teach principles of morality (RCW 28A.67-.110) is not impaired and creates no danger of encouraging expression of approval and of imitation. Likewise to

say that school directors must wait for prior specific overt expression of homosexual conduct before they act to prevent harm from one who chooses to remain "erotically attracted to a notable degree towards persons of his own sex and is psychologically, if not actually disposed to engage in sexual activity prompted by this attraction" is to ask the school directors to take an unacceptable risk in discharging their fiduciary responsibility of managing the affairs of the school district.

In the instant case, Sandra Schuster and Madeleine Isaacson were and are living together in a homosexual relationship. The respondents are living together with their children as a family unit.

The respondents have been engaged in publicizing the homosexual cause in general and their lesbian relationship. They have given a series of lectures and granted interviews where they discussed their own homosexual lifestyle. The children have accompanied respondents at some of these engagements, and the respondents and their children participated in making a movie which depicts the lifestyle of two families bound together by homosexual parents.

They have advertised in a brochure entitled "The Gay Family: A Valid Life–Style?" in which they offered interested persons a booklet, "Love is for All", and information about a film entitled "Sandy and Madeleine's Family", and also offer to make personal appearances. An article in the San Francisco Chronicle with the headline "The Lesbian Love of Two Mothers" explained the appearance of the two women visiting in the Bay Area publicizing their film.

From such publicizing it can be readily seen that they are not content to pursue their lifestyle but are also using their children for the purpose of advocating and proselytizing that style.

I am unable to understand how the court can declare that a school teacher who only admitted to his preference as a homosexual and did not engage in any overt act, is guilty of immorality, and yet, in the instant case, can find perfectly moral the conduct of the respondents.

The State does have an interest in the matter of heterosexual acts versus homosexual acts. Professors J. Harvie Wilkinson III and G. Edward White, writing in 62 Cornell L. Rev. 563, 595–96 (1977), in an article entitled "Constitutional Protection for Personal Lifestyles", state that:

> [t]he most threatening aspect of homosexuality is its potential to become a viable alternative to heterosexual intimacy. This argument is premised upon the belief that the practice of an alternative mode of sexual relations will inimically affect the predominant mode. Thus, any recognition of a constitutional right to practice homosexuality would undermine the value of heterosexuality and the institutions and practices—conventional marriage and childrearing—associated with it.
>
> This state concern, in our view, should not be minimized. The nuclear, heterosexual family is charged with several of society's most essential functions. It has served as an important means of educating the young; it has often provided economic support and psychological comfort to family members; and it has operated as the unit upon which basic governmental policies in such matters as taxation, conscription, and inheritance have been based. Family life has been a central unifying experience throughout American society. Preserving the strength of this basic, organic unit is a central and legitimate end of the police power. The state ought to be concerned that if allegiance to traditional family arrangements declines, society as a whole may well suffer.
>
> Disapproving sexual conduct that might threaten traditional family life is arguably a means related to this end. Criminal law provides perhaps the strongest vehicle for expressing such disapproval. On the other hand, it is not the only vehicle for enforcing conventional mores; community disapproval of errant behavior is arguably a more potent enforcement mechanism than the law. Moreover, the criminal law's effectiveness will be reduced if social practices and attitudes run counter to its underlying assumptions. Yet criminalization, whatever its lack of perfection as a deterrent, is a dramatic symbol of social disapprobation. Decriminalization means, quite literally, the removal of disapproval, the recasting of the state's posture as one of neutrality.

> In seeking to regulate homosexuality, the state takes as a basic premise that social and legal attitudes play an important and interdependent role in the individual's formation of his or her sexual destiny. A shift on the part of the law from opposition to neutrality arguably makes homosexuality appear a more acceptable sexual lifestyle, particularly to younger persons whose sexual preferences are as yet unformed. Young people form their sexual identity partly on the basis of models they see in society. If homosexual behavior is legalized, and thus partly legitimized, an adolescent may question whether he or she should "choose" heterosexuality. At the time their sexual feelings begin to develop, many young people have more interests in common with members of their own sex; sexual attraction rather than genuine interest often first draws adolescents to members of the opposite sex. If society accorded more legitimacy to expressions of homosexual attraction, attachment to the opposite sex might be postponed or diverted for some time, perhaps until after the establishment of sexual patterns that would hamper development of traditional heterosexual family relationships. For those persons who eventually choose the heterosexual model, the existence of conflicting models might provide further sexual tension destructive to the traditional marital unit.

(Footnotes omitted.) These arguments were endorsed by one of the authors, Professor Wilkinson.

The Superior Court of New Jersey held in *In re J.S. & C.*, 129 N.J. Super. 486, 324 A.2d 90 (1974), that granting a father, who was deeply involved in the movement to further homosexuality, the right to unrestricted visitation would not be in the best interest of the children, and that such visitation right should extend to the daytime hours only. And in *Chaffin v. Frye*, 45 Cal. App. 3d 39, 119 Cal. Rptr. 22 (1975), where a mother was a homosexual living with a female companion in the same apartment that the children would occupy, the trial court's implied finding that an award of custody to the mother would be detrimental to the children was sustained.

In this case the trial court found, in the original trial, that both parents were fit and proper persons to have the

custody of the children. The fathers have since remarried and have established good homes. Where should the scale of justice be tipped? In favor of the mothers who are living in a lesbian relationship? Or on the side of the fathers whose lifestyles and relationships are considered normal and moral?

On the state of this record, the primary and paramount consideration in awarding the children to a parent is the welfare of the children. I would hold that the mothers are not morally fit to have the custody of the children, and I would award the children to the fathers.

WRIGHT, C.J., and HAMILTON, J., concur with ROSELLINI, J.

Petition for rehearing denied February 28, 1979.