[No. 48749-9.   En Banc.   September 22, 1983.]

*In the Matter of the Marriage of* CHERYLL
CABALQUINTO, *Respondent, and* ERNEST
CABALQUINTO, *Appellant.*

*Gibbs, Douglas, Theiler, Yaroshefsky & Drachler,* by
*Mary Alice Theiler,* for appellant.

*Richard B. Sanders,* for respondent.

*Elizabeth Thomas* on behalf of American Civil Liberties
Union of Washington Foundation, amicus curiae for appel-
lant.

DOLLIVER, J.—Ernest Cabalquinto and his former wife

Cheryll Grover are involved in a dispute over Ernest's rights of visitation with their 8–year–old son Michael. Ernest Cabalquinto appeals from a King County Superior Court decision denying his request for an order allowing visitation with Michael in California.

Ernest and Cheryll Cabalquinto were married on March 3, 1973. The couple resided in Colorado Springs, Colorado, where Cheryll gave birth to their son Michael on January 7, 1974. On July 30, 1976, the Cabalquintos were divorced in Colorado Springs.

In the divorce decree, the District Court for El Paso County, Colorado, granted custody of Michael to Cheryll. The Colorado court awarded Ernest the following visitation rights:

2. That the Respondent, Ernest Cabalquinto, be allowed reasonable rights of visitation, which rights are to be liberally construed considering the distance involved between the parties, so that the Respondent be allowed liberal rights particularly during the summer months, and that the parties hereto alternate the major holidays so that each shall have the opportunity to have the minor child with him or her for those major holidays in different years.

Shortly before the Colorado court entered the custody decree, Cheryll moved to King County, Washington, with Michael. She has now remarried and lives in Renton with her husband Ronald Grover. Soon thereafter, Ernest moved to San Francisco, California. He now resides in Concord, California, a suburb of San Francisco.

For approximately 4 years after the divorce, Ernest visited his son Michael in King County, where Ernest's parents also reside. During that time Ernest visited his son on an average of one or two times a year. The length of the stay ranged from a few days to over a week for each of these instances. Ernest was given the opportunity to see Michael in the Seattle area whenever he so desired.

In 1980, however, Ernest decided he would like Michael to visit in California instead. When Cheryll refused to allow Michael to go to California, Ernest filed a motion in King

County Superior Court for an order clarifying his visitation rights under the Colorado divorce decree. Ernest asked the court to establish a visitation schedule whereby the court would allow Michael to visit him in California for substantial periods in the summer months and on several holidays throughout the year. Cheryll objected, arguing that a modification of the decree, as opposed to an interpretation, would be necessary to enable Ernest to take the child outside the King County court's jurisdiction. The King County court avoided the procedural problem by treating Ernest's petition as one to clarify the Colorado decree and, in the alternative, as a petition to modify the divorce decree.

After a hearing on August 14, 1980, the trial court denied Ernest's request for the California visitation. The court found the existing pattern of visitation in King County at the home of Ernest's parents to be "fair, reasonable and in the best interest of the child." The existing visitation rights were found to have "resulted in a close relationship between the father and the son and [was] one which has been accomplished without undue expense or inconvenience." Clerk's Papers, at 6. Ernest's visitation with Michael in the Seattle area at the home of his parents was held to be a reasonable fulfillment of the Colorado decree of dissolution and was in the best interests of the child. The court further held it was not in the best interests of the child for the father to be permitted to remove the child from Washington for visitation at the home of the father in California.

In matters dealing with the welfare of children, trial courts are given broad discretion. *Schuster v. Schuster,* 90 Wn.2d 626, 632, 585 P.2d 130 (1978); *Joslin v. Joslin,* 45 Wn.2d 357, 364, 274 P.2d 847 (1954). A trial court's disposition of a case involving rights of custody and visitation will not be disturbed on appeal unless the court manifestly abused its discretion. *Schuster v. Schuster, supra; Munoz v. Munoz,* 79 Wn.2d 810, 813–14, 489 P.2d 1133 (1971); *Joslin v. Joslin, supra.* Therefore, the issue presented by this case is whether the trial court manifestly abused its

discretion by refusing to change the existing pattern of visitation.

Ordinarily, with the facts as presented heretofore, we would find no manifest abuse of discretion and would affirm the trial court. The trial court found the existing arrangement of visitation presented Ernest with reasonable rights of visitation, a finding with which we are inclined to agree. There is, however, one additional fact. Ernest is homosexual. At the time of the marriage Ernest advised Cheryll he was bisexual. The record indicates his homosexual behavior was a factor in breaking up the marriage. Ernest is presently living with his avowed homosexual lover in Concord, California.

In his oral opinion, the trial judge expressed a strong antipathy to homosexual living arrangements. He expressed the view that "a child should be led in the way of heterosexual preference, not be tolerant of this thing [homosexuality]" and that "it can[not] do the boy any good to live in such an environment. It might do some harm."

Ernest points out the undisputed testimony of his witnesses was that the visitation would not be harmful. There is no evidence in the record to the contrary. Furthermore, the trial court made no findings a visitation could endanger the physical, mental, or emotional health of the child. *See* RCW 26.09.240. There is nothing in the record to indicate the visitation proposals of Ernest were unreasonable. This does not mean, however, that the only reasonable rights of visitation are those claimed by Ernest.

In reviewing the entire record before us, we cannot tell what standards of law the trial court followed in reaching its decision on visitation rights. While the findings and conclusions of law suggest the homosexuality of the father was not the determining factor, the unfortunate and unnecessary references by the trial court to homosexuality generally indicate the contrary.

■ It is the function of the trial court to weigh the facts and make its ruling. It is the function of this court to state the appropriate legal standards against which the facts

must be weighed. We now make specific the rule of law which was subsumed in the decision in *Schuster v. Schuster, supra*: homosexuality in and of itself is not a bar to custody or to reasonable rights of visitation. This rule is consistent with the decisions of other state courts. *See, e.g., D.H. v. J.H.,* ___ Ind. App. ___, 418 N.E.2d 286 (1981); *Di Stefano v. Di Stefano,* 60 A.D.2d 976, 401 N.Y.S.2d 636 (1978); *Nadler v. Superior Court,* 255 Cal. App. 2d 523, 63 Cal. Rptr. 352 (1967); *Bezio v. Patenaude,* 381 Mass. 563, 410 N.E.2d 1207 (1980). *See also* Rivera, *Our Straight–Laced Judges: The Legal Position of Homosexual Persons in the United States,* 30 Hastings L.J. 799, 883 (1979); Campbell, *Child Custody, When One Parent Is a Homosexual,* 17 Judges' J., No. 2, at 38 (1978). It is also consistent with our view that custody and visitation privileges are not to be used to penalize or reward parents for their conduct. *See, e.g., Andersen v. Andersen,* 75 Wn.2d 779, 781, 453 P.2d 856 (1969); *Malfait v. Malfait,* 54 Wn.2d 413, 418, 341 P.2d 154 (1959); *Norman v. Norman,* 27 Wn.2d 25, 27, 176 P.2d 349 (1947).

It seems apparent from the record the trial court did not grasp the significance of *Schuster v. Schuster, supra.* Visitation rights must be determined with reference to the needs of the child rather than the sexual preferences of the parent. The best interests of the child remain paramount. RCW 26.09.240. Since we are unable to determine the basis for the trial court's ruling, we are unable to determine whether the ruling was an abuse of discretion. *See Turner v. Walla Walla,* 10 Wn. App. 401, 405, 517 P.2d 985 (1974). *See also Mayes v. Emery,* 3 Wn. App. 315, 321–22, 475 P.2d 124 (1970).

The case is remanded to the King County Superior Court for further consideration and a determination, consistent with this opinion, of the visitation rights of Ernest Cabalquinto.

UTTER, DIMMICK, and PEARSON, JJ., concur.

DORE, J., concurs in the result.

STAFFORD, J. (concurring in part, dissenting in part)—I do not attempt to pass judgment on the subject of homosexuality per se or on the overtones of societal opinion concerning morality or immorality. These issues are not before this court. Rather, the question is whether the trial court, in the context of the facts herein, abused its discretion by giving primary consideration to homosexuality in its ultimate disposition of the case.

In its desire to avoid actually coming to grips with specific application of the correct law, the majority has resorted to a rather transparent discussion of "abuse of discretion." By concluding that the record provides an insufficient basis from which to evaluate the trial court's exercise of discretion, the majority has given judicial condonation to the personal feelings of the trial judge.

Even a broad grant of discretion does not excuse a trial court's failure to consider *relevant* issues within the established statutory framework. In making the father's homosexuality its primary consideration, the trial court lost sight of the duties owed both to the child and to his father. While I agree with the majority that a parent's sexual preference, standing alone, cannot be used to restrict visitation rights, I cannot agree with the majority's disposition of the visitation issue. I therefore must dissent.

The majority correctly notes the broad discretion granted to trial courts in domestic relations cases. *Andersen v. Andersen,* 75 Wn.2d 779, 782–83, 453 P.2d 856 (1969). Indeed we have consistently deferred to trial courts in such cases except where there has been a manifest abuse of discretion. *Munoz v. Munoz,* 79 Wn.2d 810, 489 P.2d 1133 (1971). Where there is such abuse, however, this court has a duty to reverse the trial court. *Munoz v. Munoz, supra; Norman v. Norman,* 27 Wn.2d 25, 27, 176 P.2d 349 (1947). *See also Robertson v. Robertson,* 19 Wn. App. 425, 575 P.2d 1092 (1978).

Under the domestic relations law of this State, the best interests of the child must be the paramount concern of the court. *In re Becker,* 87 Wn.2d 470, 477–78, 553 P.2d 1339

(1976). As important as this consideration is, however, it must nevertheless be balanced against a parent's fundamental right to be a parent. This right is of constitutional magnitude and cannot be restricted without a rational reason for doing so. *See Stanley v. Illinois,* 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972). Further, our State Legislature recognized the necessity of balancing the rights of the parent with the best interests of the child by providing:

> The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child *but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical, mental, or emotional health.*

(Italics mine.) RCW 26.09.240.

This statute requires that a court make a finding of specific harm to the child before restricting a parent's visitation rights. The majority suggests that as long as Mr. Cabalquinto had the alternative of visiting his son in Seattle, his visitation rights were not unreasonable. I cannot agree. In totally prohibiting Michael from visiting his father in California, the trial court clearly restricted Mr. Cabalquinto's visitation rights. Moreover, this restriction was imposed without the requisite concurrent finding of harm to the child.

If the course of action chosen by a particular court is based on unreasonable or erroneous grounds, the court has abused its discretion. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 482 P.2d 775 (1971). We cannot avoid overturning a decision such as this in which the trial judge clearly allowed his personal feelings to dictate the result. A decision which is based on untenable or erroneous grounds rather than upon objectivity and impartiality must, by definition, be the product of manifest abuse of discretion. Under the circumstances of this case, I would find that not only was the basis for the trial court's decision inherently unreasonable, but its chosen course of action clearly was unsupported by the evidence or the law.

An examination of the record below leaves no doubt the trial judge allowed his declared views on homosexuality to color his evaluation of the evidence. In finding of fact 6, the trial court states in part:

> Therefore, because the father is living in a homosexual relationship in California and because he has reasonable rights of visitation here, the court finds it is not necessary to direct that the child be removed from the jurisdiction and be placed in the father's home in California in order to fulfill the visitation.

The majority correctly holds that homosexuality is not in and of itself a bar to either custody or reasonable visitation rights. Majority opinion, at 329. *See also Schuster v. Schuster*, 90 Wn.2d 626, 585 P.2d 130 (1978). The majority nevertheless holds that because it is unable to determine the basis for the trial court's ruling, it is thus unable to determine whether the ruling is an abuse of discretion. Majority opinion, at 329. I might agree if the trial court had not clearly declared that Mr. Cabalquinto's avowed homosexuality was a deciding factor. Unlike the majority, I do not choose to sweep this difficult problem under the rug. I am willing to accept the trial court's findings of fact and oral opinion at face value and therefore have no problem finding an abuse of discretion.

In its oral opinion, the trial court repeatedly commented on the immorality of homosexuality while at the same time acknowledging that "everything about" Mr. Cabalquinto had made a favorable impression. The trial court stated:

> The father frankly states he wants his boy to choose the kind of life he wants to live. Well, in my view a child should be led in the way of heterosexual preference, not be tolerant of this thing. God Almighty made the two sexes not only to enjoy, but to perpetuate the human race. And after all, that is the most valuable aspect of sexual behavior, perpetuating the human race.
>
> I certainly can't find that the boy's best interest would be served by being subjected to this tolerant attitude, in view of the fact that I do think also that the rights of the father have to be considered, and he can in all reason

come to know this boy, enjoy his company, free from this environment which could be harmful to him.

The court's comments on homosexuality must be juxtaposed against the trial court's findings which clearly favor the proposed visitation. As noted above, the trial court failed to make any finding indicating that a visit to Mr. Cabalquinto's home in California would in any way be harmful to the child. To the contrary, the uncontroverted evidence clearly shows Mr. Cabalquinto is a loving father with a stable home environment. A psychologist specializing in gender identification testified that a child's sexual preference is developed early in life and that a child of Michael's age would not be influenced by his father's homosexuality provided the father did not flaunt his sexuality. The trial court accepted this testimony as well as that of the social worker who, after investigating both Mr. Cabalquinto and his partner, recommended that Michael be allowed to visit in California. Mr. Cabalquinto emphasized his belief that a display of affection should be left behind closed doors and promised not to be indiscreet in his conduct. Finally, the trial court disagreed with the former Mrs. Cabalquinto and found that Michael was old enough to spend 2 weeks with his father 1,000 miles away from his home in Seattle.

Despite the overwhelming evidence supporting the proposed visitation, however, the trial court nevertheless found that a visit to the father's home was not in the child's best interests. This conclusion is unsupportable absent the trial court's finding of some specific harm to the child. The trial court found only that the child might be harmed by exposure to a homosexual environment, which standing alone does not comply with the law concerning homosexual parents. The trial court's decision restricts the liberal visitation rights granted in the original Colorado decree with virtually no evidence in the record to support the restriction. The State may not restrict a parent's reasonable visitation rights merely because that parent's lifestyle is not within the societal mainstream. *Bezio v. Patenaude,* 381 Mass.

563, 410 N.E.2d 1207 (1980).

Under the circumstances of this case, I cannot agree with the majority that the record provides an insufficient basis from which to determine an abuse of discretion. The trial court misconstrued the law and improperly relied on that misconception in denying the requested visitation. In the absence of evidence or findings suggesting any particular harm to the child, I would hold that the trial court abused its discretion. Further, nothing would be gained by the wholly undirected remand employed by the majority. This is particularly true if the case is to be remanded to the trial judge who clearly relied on his own personal views to arrive at incorrect reasons for the ultimate ruling. I would specifically direct that the cause be reversed and remanded for a new trial consistent with the law of this State as expressed herein.

WILLIAMS, C.J., BRACHTENBACH, J., and CUNNINGHAM, J. Pro Tem., concur with STAFFORD, J.